IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LEIF HINTERBERGER,           )
49-50, LLC,                  )
CARREAU DESIGN CORPORATION   )
49TH STREET SHOPS LLC,       )
UPTOWN RETAIL LLC, and       )
UPTOWN BUSINESS CENTER, LLC, )   1:16-cv-1341 SEB -MJD
                             )
                Plaintiffs,  )
                             )
v.                           ) Case No. _____
                             )
CITY OF INDIANAPOLIS,        )
CHARLES CAGANN, AND MANSUR REAL )
ESTATE SERVICES, INC.        )
                             )
                Defendants.  )

COMPLAINT
DEMAND FOR JURY TRIAL

For their complaint against the City of Indianapolis, Charles Cagann, and

Mansur Real Estate Services, Plaintiffs Leif Hinterberger ("Hinterberger"), 49-50, LLC,

Carreau Design Corporation, 49th Street Shops LLC, Uptown Retail LLC, and Uptown

Business Center, LLC (collectively, "Plaintiffs") state as follows:

**NATURE OF THE ACTION**

1.     The City of Indianapolis (the "City"), including through its Department of

Metropolitan Development (the "DMD"), has for years – although only recently discovered

-- implemented policies and practices to favor friends, family, and political contributors, in

connection with real estate development and financing for developments in the City of

Indianapolis. As part of these real estate development and financing practices, the City and

DMD purposefully buried and delayed competing projects while advancing the interests of favored developers, family, and/or friends. As described herein, the City's secret policies and practices destroyed Plaintiffs' real estate development business.

2. As further discussed below, from 2005 through approximately 2014, Plaintiffs' business was focused on a substantial real estate development effort at 49th Street and College Avenue in Indianapolis. During this time, the City working through various officials and appointed agents including but not limited to Maury Plambeck, Michael Huber, and Chuck Cagann promised funding and approvals to Hinterberger including that the College Avenue development plan ("The Uptown") was to be "first priority" and the "Gateway" to other projects in Indianapolis that Hinterberger and his affiliated companies would also develop.

3. In exchange for and reliance upon those promises, and following the numerous and ever-changing demands from the City, Plaintiffs, committed their business, millions of dollars and other resources, and access to confidential and proprietary information to locate the best locations, obtain source financing, and create the economic modeling and plan to foster and support growth in the surrounding area. While Hinterberger and his affiliates did as the City instructed, in detrimental reliance on the promises made, the Defendants never honored their promises, and to the contrary took acts and steps that undermined and/or were otherwise inconsistent with the commitments. And further, the City improperly obtained access to confidential and proprietary information based on their promises, and then later used and disclosed Plaintiff's formulas, strategies, development plans, and ideas to enable others (including favored developers, donors, and friends) to obtain the funding, projects, and approvals promised to Hinterberger but never

delivered, without the burdensome (and ever changing) restrictions and delays that undermined Plaintiffs' real estate development efforts. As a result, the Plaintiffs have incurred damages well in excess of $20 million dollars, including without limitation lost equity in The Uptown project, the real property comprising The Uptown (and other pieces of property used as sources of funding for The Uptown project), millions of dollars of resulting debt, lost compensation for work Hinterberger developed for which he was not paid, and distribution of his work in contravention of non-disclosure agreement. Through this suit, Plaintiffs seeks recovery for the foregoing damages, and for the years of work for which others have been unjustly enriched, as well as for the violation of his constitutional and civil rights by the Defendants.

## PARTIES AND OTHER KEY PLAYERS

4.     Leif Hinterberger currently is a resident of the State of Ohio, and citizen of the United States. For much of the relevant time period, Mr. Hinterberger lived and worked in the City of Indianapolis.

5.     Carreau Design Corporation is a wholly owned company of Leif Hinterberger, and which Hinterberger used to work on various real estate development projects, including but not limited to creating and developing impact project, regional and corridor economic studies and plans, as well employing personnel working on such plans. Carreau Design is a for profit domestic corporation, which has been administratively dissolved since July 9, 2013. Such administrative dissolution is related to Defendants' conduct as described below.

6.     49-50, LLC is wholly owned by Leif Hinterberger. 49-50 LLC is an Indiana limited liability company created in conjunction with the development The Uptown project

3

at 49th Street and College Avenue. 49-50, LLC has been in administrative dissolution since December 4, 2014. Such administrative dissolution occurred due to the result of the Defendants' conduct as described below.

7.  49th Street Shops LLC is wholly owned by Leif Hinterberger. 49th Street Shops is an Indiana limited liability company created in conjunction with The Uptown project at 49th Street and College Avenue. 49th Street Shops, LLC is in administrative dissolution, and has been since September 10, 2015. Such administrative dissolution occurred due to the Defendants' conduct as described below.

8.  The Uptown Business Center, LLC is wholly owned by Leif Hinterberger. The Uptown Business Center is an Indiana limited liability company that was created in conjunction with The Uptown project at 49th Street and College Avenue, and is in administrative dissolution, and has been since January 7, 2016. Such administrative dissolution occurred due to the Defendants' conduct as described below.

9.  Uptown Retail LLC is wholly owned by Leif Hinterberger. Uptown Retail, LLC is an Indiana limited liability company that was created in conjunction with The Uptown project at 49th Street and College Avenue. Uptown Retail, LLC is in administrative dissolution, and has been since September 10, 2015. Such administrative dissolution occurred due to the Defendants' conduct as described below.

10.  The City of Indianapolis (sometimes referred to herein as the "City") is an Indiana municipal corporation established pursuant to Indiana law. The DMD is a duly constituted department within the City of Indianapolis.

11.  Michael Huber was the Deputy Mayor of the City of Indianapolis, Director of the Indianapolis Bond Bank, Director of Community and Economic Development, and

4

with supervisory authority over the Department of Metropolitan Development during the relevant time period.

12.     Maury Plambeck was a senior official who was the day to day head of the City of Indianapolis Department of Metropolitan Development. Senior officials in the Department of Metropolitan Development were Reggie Walton and Steve Myers.

13.     Defendants Mansur Real Estate Services, Inc. ("Mansur") is a real estate development and services company.  Mansur is an Indiana corporation with its principal place of business at 10 West Market Street, Suite 700, Indianapolis, Indiana.

14.     Defendant Chuck Cagann is a partner at Mansur, and is a citizen and resident of the State of Indiana.  Cagann was appointed by the City as an agent, liaison, and advisor on behalf of the City to work with Hinterberger.

## JURISDICTION AND VENUE

15.     Jurisdiction is proper in this court based on federal question jurisdiction, including but not limited to the fact that Hinterberger has causes of action under 42 U.S.C. § 1983.  The court has supplemental jurisdiction over Plaintiffs' state law claims.

16.     Venue is appropriate in this judicial district, as many of the acts complained of occurred in this judicial district, and some and/or all of the Defendants reside in this judicial district.

## BACKGROUND

17. Leif Hinterberger was a distinguished developer, designer/builder, and architectural consultant in the City of Indianapolis. Hinterberger worked on many projects including development projects in tipping point areas that he identified, and through his investment and work was able to create meaningful developments that had significant and beneficial impacts in the surrounding area.

18. Over a fifteen year period, Hinterberger played a central role in creating interest in and developing the plan for meaningful community and economic development in several of the most significantly prime locations in Indianapolis, including in downtown Indianapolis on Massachusetts Avenue, North Broad Ripple along the Monon Trail, and the areas north of downtown from Massachusetts Avenue north on College Avenue through Broad Ripple, including what is now referred to as Midtown.

*The Waldorf*

19. Hinterberger's efforts to develop and rejuvenate downtown Indianapolis started with a property known as The Waldorf. Hinterberger invested approximately $1 million in connection with that redevelopment effort. His success with The Waldorf triggered a host of other developments in the area, and received recognition from the City, its preferred not-for-profit neighborhood associations, and its preferred corporate partners.

*500 Walnut*

20. Hinterberger also successfully put together the development located at 500 Walnut, another property with proximity to downtown Indianapolis. Hinterberger spent five years negotiating for and acquiring the property that comprised this location under contract. Once under contract, Hinterberger was approached to partner with Citimark, and began the preconstruction work at that location.

6

*49th And College Avenue Developments*

21.     Hinterberger's success with The Waldorf, 500 Walnut, and other rehabilitation and development efforts near downtown Indianapolis, as well as in Broad Ripple, the Meridian Kessler neighborhood, and surrounding area, led to his efforts to concentrate on "center impact" community development projects in other emerging parts of the City, staging the ground for a steady pipeline of business, trending at the right time, and at the best locations.  Based on his own modeling and proprietary analysis of the City in the effort to determine key tipping point areas, Hinterberger identified 49th Street and College Avenue as a gateway to greater economic impact not only in the immediate surrounding area, but also to other key points south of 49th Street that Hinterberger planned to develop.  Hinterberger's research revealed that unless 49th and College had successful development and investment, the depressed environment in that area would extend northwards, while imperative reinvestment for the historic community mixed use nodes to the south would remain stagnant.  As such, without development at 49th Street and College, the City's regional economics would be adversely impacted, and would jeopardize the foundation of hundreds of millions of federal public dollars which were spent trying to stabilize the neighborhoods of Mapleton Fall Creek and Martindale Brightwood.

22.     Consistent with his analysis, Hinterberger acquired the Uptown Business Center in February 2005.  Across the street, Hinterberger acquired Lots 1-5 at the corner of 49th and College (to do a project that would be called "The Uptown").

**The City of Indianapolis Instructs And Directs**
**Hinterberger's Actions At The Uptown**

*The Original Plan*

7

23.     Hinterberger initially planned to develop Lots 1-5 into retail space. That development was not dependent upon any governmental source funding but needed certain zoning approvals. Hinterberger was prepared to proceed with this effort without any material assistance from City of Indianapolis or the State of Indiana.

*The City's Instructions And Demands*

24.     In 2005, Hinterberger approached City of Indianapolis officials, including officials in the Department of Metropolitan Planning, to discuss zoning issues regarding the Uptown retail plan.

25.     City of Indianapolis officials and representatives, including the head of the Department of Metropolitan Planning, Maury Plambeck, expressed interest in Hinterberger's methodology for identifying tipping points and development locations, as well as the economic advantages of The Uptown development and development of the surrounding area. Unbeknownst to Hinterberger, and only has recently come to light, the City's interest was grounded in (i) obtaining sophisticated proprietary development work at no cost, (ii) utilizing the work to identify the highest and best locations for development and gather support for such, and (iii) taking that work to obtain source funding, and then sharing the proprietary work and source funding with the favored developers and others with familial connections or friendships with the City.

26.     Plambeck and other City officials told Hinterberger that the City of Indianapolis wanted Hinterberger to proceed not only with The Uptown, but also with subsequent projects along the College Avenue Corridor. Plambeck conveyed to Hinterberger that in order to support and assist his efforts to obtain approvals and zoning

from the City – not only for The Uptown project, but also for other work at nodes running south on the College corridor – Hinterberger needed to meet certain demands.

27.     Plambeck instructed Hinterberger to add density to The Uptown project by adding apartment spaces and parking and then shrinking his proposed retail project, all of which would involve the acquisition of additional space (Lots 6-9).  In other words, in order to gain the City's approvals and source funding for The Uptown project and other planned development efforts, Plambeck demanded that Hinterberger make an investment in the entire block.  This would involve an additional cash investment of at least another $1 million (above and beyond the initial $1 million already spent on acquisition and pre-development) and would drastically alter the project that Hinterberger originally proposed. Further, such activities would take additional time not only in acquisition, but also in terms of waiting for source funding (which Hinterberger's original plan did not require), as well as cause diversion from the ongoing development projects at 500 Walnut, and others that Hinterberger had identified as next highest and best investment impact locations.

28.     The City of Indianapolis, through Plambeck, instructed Hinterberger to work with a designated city liaison for this project, Chuck Cagann.  Cagann would act as an advisor to Hinterberger on behalf of the City, and in his role as liaison would communicate with the City in regards to the matters that Hinterberger and Cagann discussed and assist in the coordination of source financing, including financing that might come from Cagann's business, Mansur Real Estate Services.

29.     The City of Indianapolis officials instructed Hinterberger to develop and perform various in depth economic studies for Cagann and the City to review and evaluate, and for the City's planning department to use for long range planning and to obtain source

financing. The City would then allocate funds to neighborhood organizations to which the City delegated authority to hold and distribute funds, consistent with the City's promises and commitments. These economic studies involved the development and application of stop-loss and multiplier effects, based on specific regional impact formulas which were proprietary to Hinterberger. As it would be necessary to obtain source funding given the expanded development demanded by the City, Hinterberger was directed to reveal to Cagann the processes and methodology that he used to choose a development location and the economic impact analysis associated with those choices relative to the 49th and College Avenue location, The Waldorf, as well as other developments in Midtown, and other areas. Cagann then would further share that information with the City and others. The City also requested that Hinterberger perform such studies and analyses in order to determine the best locations for additional developments, in order to implement regional tipping point development impacts, from Midtown south to downtown Indianapolis.

30. Cagann and Plambeck instructed Hinterberger to forgo working and devoting further time and resources on the 500 Walnut project and The Waldorf, and concentrate on The Uptown and future promised projects in the Midtown area.

31. The City wanted Hinterberger to devote his leadership expertise, properties, financing, and turnaround expertise as he worked and met with people in the neighborhoods – efforts that entailed significant time, often meeting with public officials and the community groups two to three times a week – in the effort to implement The Uptown, and thereby assist in restoring the center of the Meridian Kessler community. This included working with neighborhood organizations in order to promote the imperative needs of the Uptown project, discussion of highest and best locations, producing the stop-

loss and multiplier impacts, and their local and regional economic affects. This itself required a large commitment from Hinterberger and his affiliated companies' resources.

*The City's Promises*

32.     Plambeck and Cagann indicated that in exchange for these actions, The Uptown project was considered to be imperative, and would be the "first priority" project in the area that Hinterberger called Midtown, and would act as a gateway to other projects that Hinterberger would be in line to do along the College Avenue Corridor and within the Midtown to Downtown regional impact area. The Uptown project at that point was a $12.5 million project. Plambeck and Cagann both said that the public financing sources were ready and available.     The public funding needs for The Uptown project totaled approximately $4.5 million, and would be funded through the following sources: low interest loans from the Indiana Land Bank, brownfield grants, and community development block grants, some of which are managed by umbrella non for profit Indiana Neighborhood Housing Partnership ("INHP"), which was headed by Maura Carlstead (whose husband was President of Citimark). The private contribution, after pre-development expenses, was to be $8 million.  Hinterberger would have received $1 million in construction fees, $1 million in developer fees as well as significant cash flow from the project.

33.     Plambeck promised Hinterberger that he would also be able to have first priority to develop the projects on the mixed use nodes that would ultimately be developed on other historic mixed used Transportation Oriented Development (also referred to as "TOD") nodes along the College Avenue Corridor – 42nd, 38th, 35th, 25th, and 22nd Streets and College.

34.     Additionally, Hinterberger was also told by Plambeck and Cagann that if he did not follow the instructions and demands of the City of Indianapolis, he would have zoning problems associated with his plans for the Uptown, just like he had begun to have with the last lot (number 6) at the Waldorf.

### Hinterberger's Detrimental Reliance And The City's Additional And Changing Promises And Directions That Created Delay, Massive Expense And Allowed Access To Confidential Information

35.     Based on the promises made by the Defendants at various times that the Uptown would be approved and funded – repeatedly referred to as imperative and first priority – Hinterberger took many significant steps in reliance on those promises.

### The Non-Disclosure Agreement

36.     The City stated that Cagann would be involved in coordinating the promised financing from the various City sources, including possibly sources from Cagann and Mansur. As such, Cagann would need to see confidential information, and that information would also be shared with City officials who were working on financing and were also intended beneficiaries of the Agreement. While excited about the prospects of Cagann's involvement, given his prior work with the City as a "master developer" in areas in Indianapolis such as Fall Creek, Hinterberger was concerned about this arrangement given that Cagann and the City would have access to his business modeling, economic proofs and other proprietary information. Plambeck and Cagann indicated that a confidentiality agreement would be appropriate and agreed to.  A non-disclosure agreement (hereinafter the "NDA") was signed by Cagann and is attached as Exhibit 1.

37.     The NDA signed by Cagann defines "Confidential Information" as "all information which (1) was used in the business of 49-50 [Hinterberger's wholly owned

limited liability company that he established for the project at 49th and College]; (2) is used in the business of 49-50 and is proprietary to, about or created by 49-50 and is made known to the Investor; (3) is designated confidential by 49-50; or (4) is not generally known by any non-49-50 personnel. Information or documents, which are generally available or accessible to the public shall be Confidential Information of 49-50 if the information was retrieved, gathered, assembled or maintained by 49-50 in such a manner not available to the public or for a purpose beneficial to 49-50. From time to time, 49-50 may, for its own benefit, choose to place certain Confidential Information or records of 49-50 in the public domain. The fact that such Confidential Information may be made available to the public in a limited form and under limited circumstances does not change the confidential and proprietary nature of such information, and does not release Investor from its duties with respect to such Confidential Information as set forth in this Agreement."

38.     Section 3 of the NDA provides that that the party who executes the NDA "agrees that it will hold all Confidential Information in strict confidence and solely for the benefit of 49-50 and that, except with the prior written consent of 49-50 or as required by laws, it will not directly or indirectly disclosure or use or authorize any third party to disclose or use any Confidential Information."

39.     Section 7 of the NDA provides that if there is a breach of the NDA, damages that are recoverable include damages suffered by 49-50 and its affiliates, such as Hinterberger and Carreau.

40.     Section 15 of the NDA provides that the signatory "shall include any and all offices, directors, employees, partners, shareholders, consultants, managers, members, agents and representatives of the Investor."

41.     Subsequently, the City and Cagann also directed that Jay Powell – the brother-in-law of high profile commercial broker and developer Bryan Chandler (and whose wife was vice-president of the City of Indianapolis Bond Bank) – would also be working with Cagann to assist in the gathering of source financing, and would also need access to the same information ostensibly for the same reason as Cagann (but he was neither a City or with Cagann's company, Mansur).  Powell executed a similar NDA.

*Hinterberger's Additional Acts Of Reliance*

42.     In reliance upon the direction of the City of Indianapolis, Hinterberger and his affiliated entities  Carreau Design and 49-50, LLC, began to develop economic models and proofs for the entire Midtown region, and revealed them to Cagann, Plambeck,(and later others in the City and State.  Hinterberger discussed those models and proofs with others to whom he was directed by the City, including not-for-profit neighborhood committees that would be used to distribute source funding.

43.     In the summer of 2006 Hinterberger invested an additional $750,000 purchasing lots 6-9 due to the City's demands to have a larger project, including additional apartments, parking for the apartments, and a larger regional economic impact, corridor gateway model.  This strategic assemblage of the property involved putting together lender packages, ultimately working with seven owners and nine lots.   By early 2007, Hinterberger's investment in the block was at around $2 million, not including amounts also invested in the Uptown Business Center located across the street, in upwards of an additional $1 million.

44.     Hinterberger established and implemented an extensive pre-development milestone list in regards to The Uptown project.  Tasks that he and his affiliated companies

performed included, but were not limited to, organizing an engineering team which drafted surveys and feasibility studies, as well as preparing architectural specifications such as site plans, elevations, floor plans, wall sections, 3 D Modeling, and a marketing package to prepare for construction.

45.     In early 2007, Hinterberger sought and received a change in zoning for the entire block (Lots 1-9) to be used for the project as the City instructed.  In so doing, Hinterberger committed to the City's recommended plan for The Uptown project based on the City's promises of funding and future projects. Zoning Commissioner Rex Joseph stated at the zoning hearing, that in twenty years of siting on the zoning board and voting on projects to be built, that The Uptown was one of the best projects he had seen and will surely have a meaningful regional impact for the community and City.

46.     Hinterberger established 49-50 LLC, which Hinterberger wholly owned, to be the mechanism though which Hinterberger would carry out the initial Lot 1-5 pre-development of The Uptown project, as well as the destination for lots 6-9 that were purchased by Hinterberger.  Later, pursuant to the direction of the City, various other companies were created in conjunction with the work at The Uptown including, but not limited to, 49th Street Shops LLC and Uptown Retail LLC.

47.     Ultimately, and based on Cagann's and Plambeck's instructions and promises regarding the Uptown and other projects in the area, Hinterberger did not proceed with his development work at 500 Walnut, and ultimately divested his interests in 500 Walnut.  In giving up these interests, Hinterberger ultimately gave up, *inter alia*, his right to a significant profit stream in excess of $2.5million. Hinterberger also did not proceed with plans to purchase the Richelieu Apartments and several other projects, which he had

been negotiating to purchase for many years. Hinterberger did not move forward with the Richelieu and other projected because he had the City's commitment to proceed with The Uptown and with other projects down the College Avenue Corridor which involved significant time and resources. City officials outlined these projects as "imperative" for the foundation of the College Avenue Corridor, surrounding neighborhoods in downtown Indianapolis, and ultimately for positively impacting the economic foundation of the entire City of Indianapolis.

48.     To take on the demands of the City, Hinterberger not only was instructed to abandon his other developments, Hinterberger committed himself, Carreau Design, his wholly owned subsidiaries such as 49-50, LLC, and personnel like Larry Klotz, to meet the demands of the City in regards to The Uptown project. Hinterberger's and Plaintiffs' commitment in this regard was evidenced through the diversion of resources and personnel consistent with the City's demands. Klotz ultimately devoted approximately three years (at the costs of several hundred thousand dollars) to work on economic development modeling. Hinterberger also hired a full time office manager for Carreau Design to assist with increased demands from the requirements imposed by the City.

49.     The Uptown project itself was going to yield a development fee of $1.5 million and would have allowed Hinterberger and/or his affiliated companies to own the entire project. All of this was to occur and be completed by sometime in 2008 and 2009, leading to significant cash flow, and placing Hinterberger and his affiliated entities in a position to proceed with subsequent projects along the College Avenue Corridor.

*The City Repeats Promises And Commitments And
Hinterberger Continues Detrimental Reliance*

16

50.     In mid-2007, the City reaffirmed its overwhelming approval of The Uptown project, and its "first priority" status, although funds were to come from different sources that originally anticipated, so funding would be delayed.

51.     Further enhancing the credibility of the City's commitment regarding The Uptown project as "first priority," the City admitted that that the delay was created by its own failures, and that delays caused harm to Hinterberger and his affiliated entities. To assist in addressing the delay associated with providing source funding, the City (through Plambeck and Cagann) told Hinterberger that loans would be made available from the Indiana Business Bank ("IBB") to cover at least some cash for taxes and for some pre-development work at The Uptown.

52.     Hinterberger, impacted by the City's delay, followed the directions and promises of the City, and borrowed monies from the IBB to cover some of the delays, taxes, and other costs as he worked towards getting the development started, including $500,000 related to properties 1-5 in August 2007. By this time, Hinterberger had already invested $2 million in The Uptown project and another $1 million in The Uptown Business Center (located right across the street), beyond his own investment of time and resources (and that of his affiliated companies), and his divestiture of interests in other projects and/or other opportunities.

*More Promises And Demands And More Reliance By Hinterberger*

53.     In November 2007, the City's mayoral election occurred.   Almost immediately after the election, Plambeck contacted Hinterberger to discuss The Uptown. Plambeck specifically stated that The Uptown project remained first priority, but that as a result of the election of Greg Ballard, the funding sources for the project would again

change. As a result, there would need to be a large affordable housing component added to the Uptown project. This was a major change in the project and a large demand by the City, particularly when Hinterberger's original plan was to have a simple retail project. Following Plambeck's new demand, the project needed to include seventy-two low income apartments and 25,000 square feet of retail space. This change created a much larger project, now involving close to $20 million, but would have larger public assistance given the large concession by Hinterberger of having a large affordable housing component and much smaller retail component. Hinterberger was expected to contribute $6 million to the project, including $2.5 million in equity and an additional $3.5 million in bank debt (beyond the approximate $2.5 million invested in pre-development costs). The City and public assistance would include approximately $9 million in affordable housing tax credits and $4.5 million in City assistance including $1,040,000 from community development block grants, TIF funds, and other sources. Beyond ownership of the property and significant cash flow upon completion, Hinterberger was to receive $1.5 in construction fees and $1.1 million in developer fees.

54.     In reliance upon the promises and directions of the City, in February 2008, Hinterberger worked on implementing the affordable housing component to The Uptown project. In so doing, Hinterberger spent an additional $75,000 on legal and architectural fees associated with further zoning issues implicated by the additional requirements of the City. Hinterberger also had to deal with a 600% increase in property tax, the bank note payments to the City-appointed community bank, as well as other increasing operating expenses. Hinterberger recruited Bob Bates an experienced person associated with affordable housing projects, who agreed to participate in The Uptown project.

Hinterberger also brought on AXIS architects to work on the project, one of the architects which the City frequently utilized. Hinterberger also was directed to continue to work with Cagann. Cagann, was to be the affordable housing consultant and work with various not-for-profits to be the affordable housing sponsor.

55. While Hinterberger was performing these tasks, he also continued to follow the instructions and demands of the City. He continued to analyze the impacts of further developments on transportation oriented development and historic mix use nodes along College Avenue and for the entire "Midtown" area, as Hinterberger began referring to the area within the economic impact boundaries of his work. To that end, Hinterberger continued to spend a significant amount of his time and intellectual energies both in developing the analysis, discussing the results, and educating the various community groups as directed by Plambeck and Cagann. This work included, but was not limited to, the creation of analyses of stop loss and multiplier effects of regional developments impact areas, the public economic benefits from the reinvestment back into the preferred quarter, and the highest and best areas of most need. This type of analysis involves the development and application of proprietary formulas that assist in selecting optimal development locations so as to evaluate impacts at the property and in the surrounding area. This was the type of proprietary development information that the City demanded access to in exchange for its promises that The Uptown project would move forward as first priority, and would also provide Hinterberger with additional work on projects along the College corridor.

56. As demanded by the City, Hinterberger disclosed this information to Cagann and others such as Plambeck and later Michael Huber (the new Deputy Mayor who

19

also oversaw the DMD, and was subsequently provided with various titles including Director of the Bond Bank, Director of Community Development, and Director of Economic Development). It was repeatedly explained to Hinterberger that this information was going to be used to support the funding requests, and once public funding was secured, that funding would be first used on the "first priority" project – The Uptown project – and then other similar projects which were to be worked on by Hinterberger and his affiliated companies.

57.     To this end, Cagann, Plambeck, and Huber advised Hinterberger to continue to prepare to be ready to start The Uptown project and to establish certain limited liability companies to implement the mixed use financial structure at the Uptown. Hinterberger did just that as he established Uptown Retail LLC, 49th Street Shops, LLC, as well as significant time preparing a structure referred to as the Uptown Apartments LLP, which was to be a partnership structure that would allow for the beneficial use of tax credits.

58.     Cagann, Plambeck, and Huber also directed that Hinterberger work with a local not-for profit entity in order to effectuate the affordable housing component that was now being required by the City. This involved providing these entities with insights and information in regards to Hinterberger's development and analyses, and the stop loss and multiplier effect of such projects. The original not-for-profit group that Hinterberger was directed to work with was the Meridian Kessler Neighborhood Association ("MKNA"), who originally had agreed to take on the affordable housing role. However, at the last minute, MKNA backed out.  Hinterberger then created his organization, named "Midtown," to engage the community and implement economic impact transportation oriented development.

59.     Hinterberger created the regional impact area name "Midtown" for the area where The Uptown project was located, and also set as it borders, all to the approval of Plambeck and Cagann.  Those borders are approximately as follows: White River to the North West, 38th to 29th to 35th Streets to the South, Keystone Avenue to the East, and 62nd Street to the North. After the economic stop loss and multiplier proofs for the entire Midtown area were developed, Cagann and Plambeck provided their approval of the Midtown borders but stated that a reduction in the impact area for The Uptown project area was appropriate.  Additional economic proofs were prepared in response to the request and a new and narrower boundary called the CAN DO! Boundary was created along the following area: 54th Street to the North, Monon Trail to the East, 38th Street to the South, Central to the West.  Hinterberger devoted significant resources (including those of his affiliated entities) to prepare studies for economic development for The Uptown project, for the Midtown area, and beyond.  Hinterberger spent significant time branding for the area.  Ultimately, the names and branding developed by Hinterberger were usurped and utilized by the City and others.

60.     In the summer of 2008 after a significant amount of the predevelopment work was done, a new not-for-profit was formed called "Harmoni," and Hinterberger was directed to work with Harmoni on the regional economic proofs so they could assist in the implementation of the marketing of the Midtown economic impacts, and the mixed use and affordable housing elements of The Uptown project.  Hinterberger was instructed to continue to work with Cagann as a liaison and advisor, who was now also going to work with Kathy Shorter, the newly-appointed Director of Harmoni, who had the authority to be the umbrella non-profit over the neighborhood associations within the Midtown area.

Shorter and Cagann continued to work with Huber and Plambeck, although at this time Hinterberger was told that Harmoni would have direct control over distribution of source funding that would be provided for The Uptown project. Harmoni was to message the imperative need messaging of the Midtown work to the community and City as a whole, as they worked to implement The Uptown project.

61.     Given the large commitment of money, time, and other resources, Hinterberger asked to be on the Board of Harmoni. He was instructed by the City, including but not limited to by Plambeck, Huber and Cagann, that he could not be on the board, or financially support the board, as that would be a conflict of interest. Unbeknownst to Hinterberger, the City and its officials were delegating authority to and utilizing such boards as a means of steering projects to preferred developers.

62.     As Hinterberger began working with Harmoni, Cagann demanded the immediate payment of $275,000 of what Cagann called a "development consultant fee" to get The Uptown project completed. Hinterberger refused, but told Cagann that once the project was completed, he would pay him the monies that he was demanding.

### The City's Additional Promises And Increased Demands And Hinterberger's Continued Performance

63.     In November 2008, Plambeck and Huber informed Hinterberger that The Uptown project would be moving forward, that Hinterberger was doing what he was being told to do, but funding would again be delayed as it needed to come through a different financial package than that previously discussed. Huber reiterated to Hinterberger that The Uptown would be the "Gateway" and "first priority" project, but that different sources would be utilized from grants from the Neighborhood Stabilization Program ("NSP"), which were derived from the federal Toxic Asset Relief Program ("TARP") funds provided

by the government as part of the nationwide bailout from the great recession that occurred earlier, and were designed for projects with "center impacts" like The Uptown. At the time, the official managing all the NSP Funds for the entire State of Indiana told Hinterberger that the Uptown was the only project in the entire State that demonstrated how to properly use these funds. Although the promised NSP funds were provided, they were not used for The Uptown project, but the information Hinterberger developed and prepared was used to access such funds. Then, the City told Hinterberger that the source funding would be from the sale of the parking meters. Those funds were not provided to The Uptown.

64.    The City was aware of these issues and continued to state to Hinterberger specifically, and the community generally, that The Uptown was first priority and moving forward. In continued reliance on those commitments, Hinterberger raised an additional $200,000 by placing a second mortgage on the Uptown Business Center, and additional monies from a group of community minded investors that were also told that the City was moving forward with The Uptown project as first priority, all to obtain $200,000 from the Indiana Housing Community Development Authority ("IHCDA") which was purportedly available. Again, despite Hinterberger meeting these demands, the pre-development loan did not materialize.

65.    All of the delay and compliance with the City's demands left Hinterberger, Carreau Design, 49-50 LLC, and the various entities Hinterberger owned in significant financial turmoil, facts also known at this time to Cagann, Huber, and Plambeck. Indeed, in the 2009-2010 time period, there were loans totaling close to $4 million that had become

23

in default relative to The Uptown project. Hinterberger also made personal guarantees totaling $4 million associated with proceeding with the Uptown project.

66.     Further, Hinterberger poured equity from separate sources into the 49th and College property, the 49th Street Shops (a small part of the retail portion of The Uptown project with a tenant and which was now operating), and the Uptown Business Center to keep the project together. Income from the 49th Street Shops was being used to deal with pre-development expenses and delays at The Uptown project, including the expense of developing the economic models and presentations demanded by the City. To that end, the collective burn rate for Hinterberger and his affiliated companies in the 2009-2010 period was approximately $50,000 per month, which was largely devoted to The Uptown project, and responding to the City's demands for information and developing studies on the stop loss and multiplier effects in the area and region, since Huber and Cagann had made it clear that such information was the economic proof upon which the funding was going to be based.

67.     Shortly thereafter, in the fall of 2009, the head of MKNA demanded that City funding be provided to Hinterberger, and Plambeck stated that a $2.5 million loan from the Indiana Land Bank would be issued. When that got delayed, a $750,000 loan was to be issued, but again did not materialize. In reliance on the additional promises to start The Uptown, and due to the additional cost of delays in the beginning of 2010, Hinterberger took out another $300,000 loan as a second mortgage on the 49-50 property, which was used to pay the predevelopment costs (and compounding expenses) of The Uptown project. However, despite the Defendants' promises and Hinterberger's reliance, all of the promised loans were delayed by the City and were never provided.

68.    In an effort to address these financial issues, in the fall of 2009, Hinterberger met with Michael Huber, who was not only Deputy Mayor, but also head of the Bond Bank (which oversaw the Land Bank) and the head of Community and Economic Development. Huber instructed Hinterberger to work with John Bales and Bryan Chandler in an effort to assist Hinterberger in addressing the debt. (John Bales was not involved long, as he soon resigned from his position after being accused of fraud.) As noted earlier, Chandler was involved in commercial brokerage with strong political ties, and involved with many of the large developers such as Browning Investments and Kite Realty (who had a top executive sat on the Indiana Housing Community Development Authority ("IHCDA") board). Hinterberger followed Huber's direction, which ultimately gave Chandler a glimpse into the confidential and increasingly delicate financial state of Hinterberger's affairs, which he would soon thereafter use to his full advantage. In any event, Hinterberger raised the $500,000 from his other properties and from other sources to address pre-development costs, and again was ready for the City to do what had been promised repeatedly.

69.    At this time, and subsequently, Huber made it clear to Hinterberger that he was not to publically complain about the manner in which the City and others had delayed the project or otherwise continued to change the requirements and scope of The Uptown project, or else the promised funding and "first priority" status of The Uptown, and work on other similar projects, would be taken away. In this same time frame, Hinterberger also met with Cagann, who made similar statements.

70.    As delays and other issues continued, Hinterberger again discussed the financial situation with Huber in the spring of 2010. Huber provided reassurances that the project would move forward, but that the project would not proceed were Hinterberger to

complain or otherwise raise issue in regards to delays or other items.  Huber directed that Hinterberger short sell certain notes and property to restructure his debt (ironically a restructuring necessitated by the instructions and machinations of the City).  However, Hinterberger was again reassured that Uptown was going to proceed.  Huber told Hinterberger that by showing the imperative need to restructure the debt, it would allow the City to leverage additional sources, as well as their Land Bank, CDBG grants and brownfield grants to start the project.

71.   Based on the City's directions and promises, Hinterberger proceeded ahead and followed Huber's direction.  Lots 6-9 of The Uptown project were sold at approximately the end of the summer of 2010 to the Melangton family.  Also, notes associated with Lots 1-5 and The Uptown Business Center were short sold as Huber directed, with the idea that a restructuring would occur.

72.   In the summer of 2010, in further reliance on the promises and representations of the City, Hinterberger began work on a website called ReBloom Uptown.  That website involved utilization of the branding efforts that Hinterberger was working on for the Midtown area, publicly showing the MidTown ReBloom UpTown Partnerships, and linking all the ReBloom UpTown Partners web sites together.

73.   While Hinterberger was again told by the City, Plambeck, Huber, and Cagann to keep doing what he was doing and that the promised funds were on the way, the City also demanded significant additions to the Uptown project, involving more investment of time and money.  For example, at this time, the City officials demanded that The Uptown project meet stringent environmental requirements by being LEED Certified with a Silver sustainable rating, as well have alternative power, renewable energy, solar and wind, all

requirements that were not placed on other projects. The City indicated that this was going to be a model for development in Midtown and other areas on the College Avenue Corridor. Beyond the delay necessitated by new and increasing demands (which had significant financial ramifications), these additions created further financial commitments by Hinterberger.

74.     In order to "assist" Hinterberger in addressing these issues, Cagann introduced Hinterberger to individuals who purportedly had experience with implementing LEED Certified elements of his project. The individuals that he introduced him to were Adam Thies, Jeff Kingsbury, and the architectural firm of Browning Day Mullins Dierdorf. At Cagann and Huber's direction, Hinterberger shared his strategic information, economics, and other development related information with these individuals. Hinterberger obeyed the directive of City and reworked all plans and discussed them with the members of the neighborhood. The City then instructed that the project be further modified by meeting even more stringent requirements for materials, including a LEED Gold Certification, in addition to reiterating the demand for alternative power, renewable energy, solar and wind, all at a significantly higher expense.

75.     The Uptown project had now increased to a $25.9 million project, but purportedly required less contribution from Hinterberger, who was to contribute $5 million, with approximately $11 million from City sources and approximately $10 million of tax credits for affordable housing.   IHCDA indicated to Hinterberger that the affordable housing tax credits would be provided if the City were to approve its funding sources, so once again Hinterberger waited for the City to perform its promises.

76.     At the end of 2010 and beginning of 2011, Hinterberger was told that The Uptown project would proceed and that funds from the Indiana Financial Authority (the "IFA") which involved a $750,000 loan, the Leaky Underground Storage Tank ("LUST") Grants, and CDBG grants were being held for The Uptown project, and would start to be distributed. However, Huber and others such as Kathy Shorter (the President of Harmoni) indicated that while the City was committed to proceed with The Uptown project and it was first priority, another obstacle to the distribution of source funding for the Uptown project had arisen,– namely that the City now needed Hinterberger's work to obtain approvals of the Midtown Master Plan through public meetings, presentations to City departments and the City, which was to guide development in the area surrounding and including The Uptown. Hinterberger's work and efforts for the prior years were indeed adopted and incorporated into the Midtown Master Plan. Not coincidentally, but unbeknownst to Hinterberger, Harmoni (or as it later became known as Midtown) was being sponsored directly and/or indirectly by large developers, Browning Investments (Jamie Browning) and Chandler who for example, sponsored the Midtown Summit Program, something that Hinterberger was told by the City was inappropriate due to conflicts of interest. In early 2011, the Midtown Master Plan was approved by the City, but such delays in that process effectively stopped IHCDA from awarding their promised increased tax credits.

77.     Hinterberger also spent significant resources, energy, and money on the ReBloom Uptown website, which was designed to advertise the Midtown area for the benefit of the City. And, ReBloom Uptown emphasized the various partnerships that the City demanded that Hinterberger participate in relative to having the project move forward.

These included partnerships with local community organizations including CAN DO!, the Meridian Kessler Neighborhood Organization, Harmoni, and Linking Families. But for the instructions and the promises of the City, Hinterberger would not have prepared the ReBloom website, and he would not have entered into and advertised those partnerships, which he did for years. If he were not promised that The Uptown project was first priority, Hinterberger would not have prepared the website or loaded its content.

*The City Makes Promises Regarding The Uptown Moving Forward,*
*But Actually Undermines The Uptown's Ability To Proceed*

78.    In the 2010-2012 time period, Hinterberger spoke and met frequently with City officials and agents in the regards to The Uptown project, including frequent conversations with Cagann and conversations with Huber. Huber consistently stated that The Uptown project would be moving forward, and that funding sources would be provided for that project. During those meetings – consistent with statements he made during earlier conversations with Hinterberger, Cagann again stated to Hinterberger that he was canvassing for source funding and housing partners and that he would tell those sources that The Uptown was first priority. Hinterberger relied on these statements to his detriment. Hinterberger, for example, continued to work to locate housing partners to assist on the project at the instruction of Cagann and Huber. Hinterberger reached back to Bob Bates, who now stated that he could not participate further in the project. Hinterberger located other housing partners .

79.    In the fall of 2010, and following Huber's direction, Hinterberger worked with Indiana Business Bank to buy back the notes on The Uptown lots 1-5 and a note associated with the Waldorf (Lot 1). The Indiana Business Bank was going to sell the notes back to Hinterberger at approximately 50% of the note value, and 10% of the property

value.  As Hinterberger worked with private financiers to get the resources together, Hinterberger learned that Chandler – the person who Huber and Cagann directed him to speak with – had bought the note on Lots 1-5.

80.     Although Chandler promised he would not proceed to foreclose on that note which was in default, he did just that.  At that time, 49-50 LLC, which owed on the note, sought bankruptcy protection.   49-50 LLC and other companies wholly owned by Hinterberger worked with private equity and financial companies to achieve a workout so that Hinterberger and/or his affiliated entities would maintain control of Lots 1-5 of The Uptown project .  Indeed, to that end, Huber and Kathy Shorter both expressly stated that Hinterberger did everything the City asked, and that once the debt was restructured, The Uptown project would proceed.

81.     However, within one week of a receiver being appointed, the City, suddenly and without notice, and even though brownfield grants had been applied for five years earlier, deployed brownfield trucks to search for and address environmental contamination at The Uptown project location.  The timing was, on information and belief, part of the City's effort to undermine Hinterberger's and Plaintiffs' efforts at The Uptown.  The presence of the City's brownfield trucks created an appearance of more serious environmental problems than existed, which led to uncertainty and doubt with Hinterberger's lenders.   Hinterberger learned that these trucks were sent out by DMD official Reggie Walton, and Hinterberger spoke directly with Walton at this time in regards to the deployment.

82.     With brownfield trucks on the property, the financial packages that were previously prepared for Hinterberger and his affiliates as part of the discussion to regain

full site control were thrown into disarray as those financiers were became concerned about possible environmental issues. Hinterberger, however, proceeded to gather new financial proposals, as Huber, Cagann, and Kathy Shorter continued to expressly tell him that the project was first priority and that it would proceed, and the environmental review would be over, suggesting that having these trucks deployed actually reflected that the project was really starting.

83.     In or around the summer of 2011, Hinterberger regained site control over The Uptown project area which had been disrupted due to the short sales directed by Huber. Hinterberger obtained an agreement regarding purchase of Lots 6-9 through a newly opened company set up to restructure the short sales and complete the pre-development, Econ Dev, LLC.

84.     By February 2012, Hinterberger had additional financial packages in place that would have allowed the Uptown project to proceed, and needed two things: the completion of a Midtown Economic Development Area Plan that the City now required, and a no-further-action letter regarding the environmental contamination to provide to the potential financiers.  The City continued to make its promises that The Uptown project would proceed.  And as a result, Hinterberger spent an additional $25,000 cleaning up, preparing The Uptown site and the historic building on the site for new appraisals, and a completing adaptive reuse renovation. Had the City not continued to reiterate its promises regarding The Uptown, Hinterberger would not have spent these monies.

85.     However, more delays were manufactured.  For example, as the Midtown Economic Development Area Plan was complete, instead of moving forward the City began a City wide TIF Study, (which then the City indicated needed to be complete before

it could proceed with the Uptown). Ultimately, Hinterberger lost site control towards the end of 2012, and the bankruptcy proceeding concluded. Huber continued to tell Hinterberger that he did great work and should be proud, and not to worry that the City will make this right, but that he could not say anything bad about the delays or the City would not assist.

86.     And, even after this time, Cagann continued to work with Hinterberger advising him that the Uptown project would still proceed and be first priority. Cagann and Hinterberger worked on a development proposal that mirrored the $20 million dollar project proposal that had been discussed six years earlier. Hinterberger continued to use the dwindling resources he had to arrange financing based on Cagann's and Huber's continued and repeated promises that the project would proceed. However, those promises proved to be false.

> *The City Effectively Takes The Remainder Of Hinterberger's Assets And Effectively Redistributes Them Along With His Work And Resources*

87.     The remainder of Hinterberger's financial assets were ravaged through similar conduct by the Defendants in 2013. In conduct that mirrored the conduct that undermined Hinterberger's efforts with The Uptown project, while Hinterberger was in the process of working to negotiate the repurchase of the promissory note and related financing for the Uptown Business Center and unbeknownst to Hinterberger at the time, Bryan Chandler – who Huber instructed Hinterberger work with –purchased the note.

88.     With this note in default, Chandler made a promise not to foreclose on the note, a promise that he ignored. And, once again, Hinterberger was forced to seek bankruptcy protection for the interests of Uptown Business Center while he attempted to address the financing concerns and payment of the note.

89.     Just as the City of Indianapolis did with The Uptown project properties, after bankruptcy protection was sought and Hinterberger was working on getting financing in place for the Uptown Business Center, brownfield trucks were deployed by Reggie Walton and others at the DMD, to the Uptown Business Center site. And, once again, by sending the brownfield trucks, the interested private financiers were scared off from proceeding given the appearance of environmental issues which were created by the existence of the brownfield trucks. Hinterberger was unable to obtain financing, and lost the Uptown Business Center property as well.

90.     While Hinterberger and his affiliated companies now lost their investments, their property, equity, and income, the City's false promises left Hinterberger only with a host of administratively defunct companies, no business, and millions of dollars in debts, guarantees, and other damages.

### The Secret Policies And Practices Of The Department Of Metropolitan Development Are Brought To Light

91.     Starting towards the end of 2014 and continuing to today, it has come to light that the City maintained and implemented secret policies and practices regarding development projects and financing that directly impacted Hinterberger, Plaintiffs, and The Uptown. The City took Hinterberger's ideas and work, and peddled those to friends and favored contractors of the City to promote and finance those projects.

92.     Indeed, while Cagann and Huber consistently told Hinterberger that The Uptown was first priority, in fact during the same time period, Cagann, Cagann's partner Lee Alig, and Huber were meeting and/or discussing with a developer (Jamie Browning Investments ("Browning")) on making Browning projects "first priority" including what is referred to as the "Coil" project. Browning not only was a large political campaign

contributor – something Browning expressly discussed when he met with Hinterberger to discuss possible involvement in The Uptown (a meeting organized by Cagann) – but he or his company acted as a financial sponsor of the Midtown's activities, for example through sponsorship of the Midtown Summit Program.

93.     The City and its agents engaged in other actions to undermine the "first priority" status of The Uptown.  For example, it has recently been discovered that City representatives would contact housing partners that Hinterberger would identify as interested in working on the affordable housing aspects of The Uptown and "advise" them not to participate in the project.  On information and belief, one such potential housing partner, Bob Bates, was told that if he were to participate with Hinterberger, he would never be able to work on another project in the State of Indiana.

94.     In June 2014, a Browning project referred to as the "Coil" project received approval and funding from the City of Indianapolis, and suddenly was referred to as "first priority."  The Browning project received TIF dollars that were obtained and sourced through the prior work and efforts of Hinterberger and were originally to be used for the Uptown project.  And the Browning project, while based on approvals for sourcing in the Midtown area and the stop loss and multiplier effect, is actually outside of the original primary Midtown (imperative economic impact proof boundaries).

95.     Unlike the delay and requirements imposed upon Hinterberger and The Uptown, the Browning project :

a.      Has no affordable housing component;

b.      Was not obliged to have community supportive services to allow the project to proceed;

    c.     Received approval of an eight-story structure, while the City limited The Uptown to three stories;

    d.     Received approval of a large number of housing units;

    e.     Was able to use TIF dollars and funds from a parking meter sale;

    f.     Was provided infrastructure grants for landscaping from the Rebuild Indy Funds; and

    h.     Was not obligated to meet LEED Green certification requirements.

96.     All of the funding sources (e.g., TIF Dollars, parking meter sources, Rebuild Indy Funds) being used for the "Coil" project had previously been portrayed to the community and Hinterberger by Plambeck, Huber, Cagann, and Shorter and other City officials as being prepared for *the* first priority project – The Uptown. These and other funding sources were based on implementing compounding market rate occupancy to empower the areas of most vacancy, and with the most needs, which is consistent with The Uptown project, *not* the Browning project, in a district where there are little to no vacancies.

97.     And, using Hinterberger's work and efforts, stop loss and multiplier impacts, as well as his other analysis of the Midtown region, Cagann and Huber were able to secure projects for Browning Investments including a contract at Speedway, and are now staged to do many others, at 38th and Illinois, 22nd and Delaware, and many more along the whole of what is referred to as the Red Line Corridor along College Avenue. On information and belief, Cagann (and possibly others) received consulting fees and benefits directly from these Browning projects, and from other projects using Hinterberger's work and efforts.

98.     Cagann was not the only one who used Hinterberger's (and his affiliated companies) confidential information for personal gain. Others who worked with Cagann have also claimed credit for the analysis and formulas that outline regional benefits in Midtown and along the entire College Avenue Corridor and the multiplier effect associated with projects, as well as the branding Hinterberger created through his work and efforts, all with the blessing and encouragement of the City. For example, Cagann's colleague and soon to be head of the DMD, Adam Thies, began taking credit for the work and analysis that Hinterberger prepared. And, Kathy Shorter, whose Harmoni organization took on the name "Midtown," also took credit for the Midtown Master Plan, which Hinterberger had largely created and assembled.

99.     The City obtained additional benefits as it obtained source financing and planning work for the entire Midtown area and larger region allowing projects to be identified that were then provided to other developers along with the source funding at no cost.

100.    In mid-2015, through the wire fraud and money laundering trial and conviction of DMD official Reggie Walton, it also came to light that the DMD had a long standing practice where it would secretly engage in practices to delay or bury some projects in order to allow favored projects to proceed. As discussed earlier, Walton was directly involved in the deployment of brownfield trucks to The Uptown project and Uptown Business Center which deployment compounded years of earlier delay to destroy Hinterberger's and Plaintiffs' effort to obtain financing for those projects.

101.    This policy and practice was admitted by other City officials, but such admission has now only been recently discovered. Hinterberger specifically approached

Huber in the spring of 2012 in regard to the numerous delays on The Uptown, and was expressly told by Huber that the City was getting ready to start The Uptown. However, Huber warned Hinterberger not to say anything negative, or else the City would not assist him. After Hinterberger left the meeting and continued in his work and efforts to allow The Uptown project to proceed, Huber told another participant in the conversation in words to the effect that "Hinterberger has been trying to do The Uptown project for years, and I keep running him around. We are not going to do the project." This admission is consistent with the secret practices and policies of the DMD described above.

### *Damages*

102.    As a result of the Defendants' actions described above, Hinterberger and his companies have lost all property ownership and equity in The Uptown, Uptown Business Center, as well as all of other properties and businesses that were used directly and/or indirectly in allowing The Uptown to move forward. These properties themselves had been valued in the millions of dollars. Hinterberger and Plaintiffs also lost the development fees, construction fees, and cash flow from these projects. Beyond these facts, Hinterberger divested ownership of properties at the insistence of the City, also valued at millions of dollars. Not only has Hinterberger lost the entirety of his equity, but also has been saddled with millions of dollars of personnel debt and guarantees incurred as a result of the delays and improper conduct by the City.

103.    If this were not enough, Hinterberger lost his entire business, his home, and his work studio. Further as a result, Carreau Design no longer has employees, and Hinterberger's various wholly owned entities are administratively dissolved or otherwise have no assets. The loss of equity, the amount of growing debt, the loss of his business,

and the loss of opportunities all leave Hinterberger having suffered damages in excess of $20 million. And Hinterberger's and Plaintiffs' work, analysis, and branding have been used to profit others, at Hinterberger's expense, and he has been uncompensated for all of this work.

## COUNT I
## MONELL CLAIM
### (Against City of Indianapolis)

104.    Plaintiffs reassert and reallege Paragraphs 1 to 103 as if fully set forth herein.

105.    As described above, the City made consistent and numerous promises and commitments to Hinterberger and his affiliated entities of approvals and funding from the City associated with The Uptown project and other projects along the College Corridor. However, the City's performance on those promises was always delayed, and never fulfilled. But, the promises led to Plaintiffs providing real property, financial investment and other valuable consulting and development services to the City for more than six years, all without any compensation. Through Hinterberger's efforts and Plaintiffs performance, the City obtained community leadership and investment, sophisticated research and information so as to assist in identifying locations that were highest and best use for development, the stop loss and multiplier effect associated with development, and obtain source financing and support for development projects. And while that was provided based on the City's promises, the City's refusal to carry out the promises and commitments made

to Plaintiffs and The Uptown project and the College Avenue Corridor, left Hinterberger and his Plaintiffs-affiliates in financial ruin.

106.   The City of Indianapolis, at all relevant times, maintains a widespread practice and policy of delaying and burying development projects in favor of advancing the interests of developers and others with friendships, familial ties or other ties to the City. As seen through the recent conviction of DMD official Reggie Walton, City officials purposefully delayed and/or otherwise undermined development projects, while at the same time accelerated projects for those favored by the City.   Such practices were implemented through continuous delay tactics, whether it be changes in source funding or continual changes in the project requirements. Others involve use of department resources such as brownfield deployment to create an appearance of issues at a property. Moreover, through these practices, the City of Indianapolis obtains access to confidential and complex analytical financial and economic reports and studies at no cost so as to utilize the information to obtain locations for development and sources of financing which are then shared with those favored by the City with personal friendships or family, or otherwise.

107.   These improper practices and policies are also advanced through the City's practice of allowing neighborhood organizations to distribute funds, as such organizations are themselves influenced by donors to influence and direct such distributions.  For example, Browning sponsored Harmoni/Midtown for some activities, even though Hinterberger was advised earlier that such support was inappropriate because it created conflicts of interest. By delegating distribution authority to neighborhood organizations which are sponsored in any way (directly or indirectly) by contributions from a developer seeking distributions and project support, or otherwise have board members who are

friends and/or are affiliated with entities seeking distributions for development projects, the City knowingly and purposefully allows projects and funding to be improperly controlled and/or otherwise influenced by those developers.

108.    These secret policies and practices were employed here to deprive Hinterberger of constitutionally protected interests.  While the City expressed outwardly its approval of Hinterberger's development plans, claiming that it was the "first priority" project, the City implemented its policy of delay through its frequent delays associated with purported changes in sources of financings, as well as through the various delays caused by the changing requirements and modifications to The Uptown project.  The delay was imposed to ensure that Hinterberger could not proceed with this development, but yet allow Hinterberger the necessary time to make financial investments, to gather public support for development in the Midtown area, to develop studies regarding where development was imperative and its economic impacts, and to garner the underlying support for the funding sources that would be obtained through the economic analysis and other items that Hinterberger provided.  However, all of these would be used in turn for other projects to proceed – all without virtually any restrictions or escalated requirements (and many times without even community support), and with immediate financing – with primarily developers or others with personal ties, friendships and/or contributions to campaigns, or the like.

109.    Further, and consistent with practices revealed as part of the trial and conviction of Reggie Walton, payments of monies impact advancement of a project. Hinterberger, for example, was expressly told by Chuck Cagann to pay him an upfront "fee" of $275,000 to get The Uptown project approved and completed, but Hinterberger

indicated that he would not pay. Of course, it is no coincidence that with no payment to Cagann, The Uptown project did not proceed.

110. Deputy Mayor Huber admitted these policies and their implementation. It has now been discovered that he told others that the City was telling Hinterberger that they would do The Uptown project, but in fact they were giving him the run around, and had no intention to do so. Consistent with this admission, while Huber was telling Hinterberger that The Uptown would be first priority, that was simply part of the delay and runaround as Huber and Cagann were directly and/or indirectly discussing with Browning (who, as he told Hinterberger directly, provides campaign contributions) that the Browning's projects would be "first priority" and the "Gateway" project in the area. The City's policy of delay and burying projects was also demonstrated when the brownfield trucks were deployed by Reggie Walton from the DMD to The Uptown project site and across the street, the timing of which not only created further delay, but made it impossible for Hinterberger to proceed with either project, and in fact led to those properties going to Bryan Chandler, another favored individual of Huber, Cagann and the City.

111. Additionally, through the implementation of the policies and practices described above, the City was provided with years' worth of strategic economic analyses, planning and development studies prepared by Hinterberger. These were developed at significant costs to Hinterberger and his affiliated companies, and reflected confidential and proprietary information. Yet, the City received it all at no cost, and used it all to the injury of Hinterberger. Cagann profited in the same fashion, but also through, on information and belief, fees and commissions he achieved through peddling Hinterberger's work.

41

112.    These policies and practices unconstitutionally deprived Hinterberger and his affiliated companies of valuable and protectable property interests, including but not limited to, Hinterberger's income and compensation, his professional livelihood, his real property ownership and retention of his intellectual property, and the operations of his various affiliated companies of which he was the sole owner.

WHEREFORE, Plaintiffs pray for the following relief against the City:

(i)     compensatory damages in the amount equal to amounts that Plaintiffs lost through their investing in The Uptown as well as amounts they would have been entitled to receive if the project had proceeded forward, in an amount in excess of $20 million;

(ii)    punitive damages in such amount as the trier of fact shall determine to be appropriate;

(iii)   the costs of this action, including reasonable attorneys' fees as authorized by 42 U.S.C. 1988; and

(iv)    such further relief as the Court determines is just and appropriate.

## COUNT II
## PROMISSORY ESTOPPEL
### (Against City of Indianapolis)

113.    Plaintiffs reassert and reallege Paragraphs 1 to 112 as if fully set forth herein.

114.    The City of Indianapolis made various promises to Plaintiffs in regards to the approvals for and financing of The Uptown project development at 49th and College Avenue.

42

115. The City of Indianapolis made and repeated these promises with the expectation that Plaintiffs would rely upon them.

116. Given the number of, nature, persons making the statements and the repetition of the promises that were made by the City of Indianapolis, Plaintiffs reasonably relied on such promises.

117. Plaintiffs reliance was definite and substantial in nature, as it included: (i) purchasing additional property at the instruction of the City; (ii) holding and financing the entire block of property; (iii) rezoning the property at the instruction of the City, including elements of affordable housing and other substantial changes that necessitated zoning changes, spending significant resources to have those change designs made; (iv) creating and financing numerous development analyses and studies to provide the best locations and support for financing, involving costly confidential information; (v) giving up his interests in other properties; (vi) following the instructions of the City to work with Cagann who proceeded to reveal and use the confidential information that was provided to him; and (vii) short selling properties as well as notes that ultimately were steered to the City and Cagann and their friends such as Bryan Chandler and others.

118. Under the circumstances, injustice can be avoided only by enforcement of these promises.

119. Application of the doctrine of promissory estoppel is not inconsistent with the public interest. To the contrary, it would be a threat to the public interest to have governmental entities make promises upon which a person and business rely, and then be allowed to change that stated position.

WHEREFORE, Plaintiffs pray for the following relief against the City:

(i)     declaring that Plaintiffs detrimentally relied upon the City's representations;

(ii)    awarding damages in an amount sufficient to compensate Plaintiffs for damages resulting from the detrimental reliance, to recover for all amounts invested and lost from foregone business opportunities in an amount in excess of $20 million;

(iii)   awarding pre-judgment interest;

(iv)    awarding Plaintiffs fees and costs incurred in this proceeding; and

(v)     such further relief as the Court determines is just and appropriate.

## COUNT III
## EQUITABLE ESTOPPEL
### (Against City of Indianapolis)

120.   Plaintiffs reassert and reallege Paragraphs 1 to 119 as if fully set forth herein.

121.   The City of Indianapolis made certain false representations in regards to the approvals and financing for the proposed Uptown development at 49th and College Avenue.

122.   The City of Indianapolis made and repeated these representations with the expectation that Plaintiffs would rely upon them.

123.   Plaintiffs had no knowledge of the falseness of these statements. Such representations induced Plaintiffs to act upon these statements to their detriment.

124.   Plaintiffs reliance was definite and substantial in nature, as it included purchasing additional property at the instruction of the City, holding that property as a whole, rezoning the property at the instruction of the City, including elements of affordable housing and other substantial changes that necessitated zoning changes, spending

significant resources to have those change designs made, ultimately rebalancing Hinterberger's debt structure at their request with the suggestion that Hinterberger then refinance and reacquire the property; giving up interests in other properties; and following the instructions of the City to work with Cagann who proceeded to reveal and use the confidential information that was provided to it.

125.    Under the circumstances, injustice can be avoided only by enforcement of these promises.

WHEREFORE, Plaintiffs pray for the following relief against the City of Indianapolis as follows:

(i)     enforcing the City's representations, and awarding Plaintiffs damages in an amount in excess of $20 million;

(ii)    awarding pre-judgment interest;

(iii)   awarding Plaintiffs fees and costs incurred in this proceeding; and

(iv)    such further relief as the Court determines is just and appropriate.

## COUNT IV
### (Violation of Equal Protection Clause Under 42 U.S.C. Section 1983)
### (Against City of Indianapolis)

126.    Plaintiffs reassert and reallege Paragraphs 1 through 125 as if fully set forth herein.

127.    Hinterberger spent significant time and resources working with the City, regarding The Uptown project.  The City promised that The Uptown project would proceed, and in making those commitments the City also demanded that Hinterberger change and modify The Uptown project at the direction of the City, claiming that such modifications were required.

128.    Hinterberger was being instructed to make countless additions to The Uptown project while being told that The Uptown was the "first priority" project. However, the City created various delays through repeatedly changing project modifications, alleged changes in source financing and other requirements for economic studies and like.

129.    While Hinterberger and his affiliated companies were treated in this fashion, the City treated other developers' projects as "first priority" without delay, without continually changing requirements, without restrictions and with immediate funding.

130.    For example, in June 2014, despite a lack of local support, the project referred to as the "Coil" that was put forth by Browning was approved and funded with a height of eight floors, while The Uptown project was forced to have significant height restrictions (limited to three floors). Additionally, monies were approved and almost immediately provided to the Coil project.  There were no requirements for LEED Silver or Gold certification, which greatly (and expensively) impacted the building materials that The Uptown could use, and all without delays in funding.  This project has also now been identified as "first priority."

131.    Moreover, as has only just been recently discovered, while the City was telling Plaintiffs that The Uptown project was proceeding but needed to include a host of new and additional elements, Huber and Cagann were discussing and/or meeting with Browning and explaining that its project(s) would be "first priority" – not The Uptown – without any of the numerous hurdles and requirements established to delay and ultimately thwart the Uptown project.

132.   The basis for the disparate treatment also became clear with the conviction of Reggie Walton of the DMD for money laundering, which trial revealed improper practices associated with the delaying and stalling of projects at the DMD.

133.   There is no rational basis for the treatment imposed upon Plaintiffs. The City intentionally treated Hinterberger and his affiliated companies differently from others similarly situated – namely other direct competitors such as Browning. The City intentionally treated Hinterberger and Plaintiffs differently because of their membership in the class to which they belonged and the difference in treatment was not rationally related to a legitimate state interest. As set forth in detail above, the City implemented and pursued practices and policies designed to favor certain developers, based on campaign contributions, friendships, or family members with direct or indirect ties to the City. The Defendants actions in this regard led to Hinterberger's and Plaintiffs' losses, and the destruction of Hinterberger's good name and career.

134.   Alternatively, the City of Indianapolis exhibited totally illegitimate animus towards Plaintiffs motivated by reasons of a personal, vindictive and/or political nature, i.e., due to Hinterberger's refusal to provide a $275,000 "fee" as demanded by the City's appointed agent for The Uptown project to proceed forward.

WHEREFORE, Plaintiffs pray for the following relief against the City of Indianapolis as follows:

(i)   compensatory damages in the amount equal to amounts that Plaintiffs lost through their investing in The Uptown as well as amounts they would have been entitled to receive if the project had proceeded forward, an amount in excess of $20 million;

(ii)      punitive damages in such amount as the trier of fact shall determine to be appropriate;

(iii)      prejudgment interest;

(iv)      the costs of this action, including reasonable attorneys' fees as authorized by 42 U.S.C. section 1988; and

(v)      such further relief as the Court determines is just and appropriate.

## COUNT V
### (Violation of Substantive Due Process Under 42 U.S.C. Section 1983)
### (Against City of Indianapolis)

135.      Plaintiffs reassert and reallege Paragraphs 1 through 134 as if fully set forth herein.

136.      Hinterberger has fundamental interests that have been violated by the City's actions, including *inter alia,* his property and liberty interests. Defendants' actions to date have directly damaged his livelihood and income.

137.      The acts of the City have arbitrarily deprived Hinterberger of his recognized property and liberty interests and violate the Due Process Clause of the Fourteenth Amendment by (i) causing Hinterberger to ultimately lose The Uptown Project and other properties; (ii) significantly harming Hinterberger's reputation and constraining his business.

WHEREFORE, Plaintiffs pray for the following relief against the City of Indianapolis as follows:

(i)      compensatory damages in the amount equal to amounts that Plaintiffs lost through their investing in The Uptown as well as amounts they are entitled

to receive if the project had proceeded forward, in amount in excess of $20 million;

(ii)     punitive damages in such amount as the trier of fact shall determine to be appropriate.

(iii)    the costs of this action, including reasonable attorneys' fees as authorized by 42 U.S.C. 1988;

(iv)     prejudgment interest; and

(v)      Such further relief as the Court determines is just and appropriate.

## COUNT VI
### (Violation of Procedural Due Process Under 42 U.S.C. Section 1983)
### (Against City of Indianapolis)

138.     Plaintiffs reassert and reallege Paragraphs 1 through 137 if fully set forth herein.

139.     Hinterberger has both property and liberty implicated here including, without limitation, interests in ownership of property and operations of his real estate development business.

140.     Defendants' actions against Hinterberger have been imposed without any opportunity to address the actions taken against him in regards to the imposition of delay and other issues that precluded Hinterberger from being able to proceed with the development of The Uptown project.  Indeed, Hinterberger was expressly told that if he were to complain or challenge the actions of the City in regards to The Uptown project, the project would not proceed forward.  Further, where performance of obligations also becomes tied to demands for "fees" (i.e., $275,000 demanded by the City's appointed agent described above), there is no real opportunity to address the improper actions.

141. Through its hidden practices, as well as by way of its improper delegation of authority to not-for-profit neighborhood associations, the City has created a scenario where Hinterberger had no access to seek redress for actions taken against him. Hinterberger was deprived of a forum by which to protect his property and liberty interests.

142. The Defendants' actions have caused significant and irreparable harm to Hinterberger and Hinterberger's career as a developer has been essentially halted. Such actions have undermined his reputation and income, which has taken years to build.

WHEREFORE, Plaintiffs pray for the following relief against the City:

(i)     compensatory damages in the amount equal to amounts that Plaintiffs lost through their investing in The Uptown as well as amounts they are entitled to receive if the project had proceeded forward, in an amount in excess of $20 million;

(ii)    punitive damages in such amount as the trier of fact shall determine to be appropriate;

(iii)   the costs of this action, including reasonable attorneys' fees as authorized by 42 U.S.C. 1988;

(iv)    pre-judgment interest; and

(v)     such further relief as the Court determines is just and appropriate.

**COUNT VII**
**BREACH OF NON-DISCLOSURE AGREEMENT**
**(Against All Defendants)**

143. Plaintiffs reassert and reallege Paragraphs 1 to 142 as if fully set forth herein.

144. At the instruction and direction of the City, including but not limited to Maury Plambeck and Michael Huber, Hinterberger was told that he needed to provide economic proofs of the impact of his proposed project at 49th and College in order to obtain the City's support in regards to financing.

145. As a result, Hinterberger brought on several individuals to work with Plaintiffs who were paid approximately $130,000 per year (in salary alone) in order to prepare the economic proofs, in addition to Hinterberger's own contributions.

146. Such materials in regards to manner of pricing and locations for projects are customarily proprietary. Indeed, the stop loss and multiplier effect analysis prepared by Hinterberger are based on proprietary calculations also developed through years of experience. Hinterberger would prepare these materials typically through Carreau Design, which would then utilize this information through various closely held companies that were all wholly owned by Hinterberger.

147. The City and Cagann recognized the proprietary nature of Hinterberger's work, and agreed to the non-disclosure agreement which was prepared in order to protect the information that Hinterberger was instructed to prepare and disclose.

148. In December 2005, Hinterberger authorized 49-50, LLC, which he owned and controlled, to enter into an agreement with Chuck Cagann, which it was understood that the City was also an intended party. Hinterberger was specifically told that Cagann would act as the City's liaison and advisor to provide Hinterberger with assistance. He was directed to provide access to Cagann, Mansur and others with access to the information he was developing.

149.   The NDA provides that the person receiving the information "will not directly or indirectly disclose or use or authorize any third party to disclose or use any Confidential information." The NDA further provides that Hinterberger is entitled to damages including lost profits. (See NDA, Section 7.)

150.   Cagann, the City and Mansur improperly gained access to Confidential information based on false promises and representations, and then used and revealed the Confidential Information for their own benefit, including by way of gathering fees and costs, as well as utilizing it against the interests of Hinterberger. The City and Cagann used this information in order to obtain source financing that it was distributing to other developers to the detriment of Plaintiff. Also, it has only recently been discovered that Cagann and Huber were peddling and ultimately awarding other projects as "first priority" in the same general area within Hinterberger's Midtown boundaries where Hinterberger's Uptown's project was going to proceed, based on source funding obtained through the proprietary work prepared by Hinterberger, and throughout other areas of the City, all to Hinterberger's detriment.

WHEREFORE, Plaintiffs pray for the following relief against the Defendants as follows:

(i)     a declaration that Defendants breached the Non-Disclosure Agreement;

(ii)    compensatory damages associated with the Defendants' breach of the Non-Disclosure Agreement;

(iii)   pre-judgment interest; and

(iv)    such further relief as the Court determines is just and appropriate.

## COUNT VIII
### Indiana Trade Secrets Act
### (Against All Defendants)

151.    Plaintiffs reassert and reallege Paragraphs 1 through 150 as if fully set forth herein.

152.    Information, studies and analyses that culminate in the identification of areas targeted for development as well as economic analyses associated with selecting areas and how associated benefits may then spread are subject to protection under the Indiana Trade Secret Act.

153.    Hinterberger's studies and analysis created in order to determine the best locations for development and the sequence of developments represent "information, including a formula, pattern, compilation, . . . method, technique or process," that is sufficiently secret to provide him and his companies a competitive advantage.

154.    Hinterberger took reasonable measures under the circumstances to maintain the secrecy of the information, including but not limited to not disclosing such information other than to those who had executed non-disclosure agreements or the intended beneficiaries, or otherwise to those to whom such signatories directed disclosure consistent with the NDA.

155.    The City, Cagann, and Mansur violated the Indiana Trade Secret Act. These Defendants have misappropriated Hinterberger's trade secrets through false promises that allowed them to gain access to such work, and then using that work for their own benefit and to the detriment of Plaintiffs.  No access would have been allowed had the City and others made clear that there was no intent to proceed with the project.

156.    As a direct and proximate result of the foregoing, Hinterberger has suffered and will continue to suffer significant and irreparable harm.

WHEREFORE, Plaintiffs pray for the following relief against the Defendants:

(i)     Declare that the City has violated the Indiana Trade Secrets Act;

(ii)    award actual losses caused by the misappropriation, as well as unjust enrichment caused by the misappropriation;

(iii)   exemplary damages in an amount to two times the amount awarded above;

(iv)    pre-judgment interest;

(v)     attorneys' fees and costs; and

(vi)    such further relief as the Court determines is just and appropriate.

**COUNT IX**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

157.    Plaintiffs reallege and reassert Paragraphs 1 through 156 as if fully set forth herein.

158.    By taking and then using years of Hinterberger's economic studies and analyses to identify locations for development and economic impacts associated with such development, the Defendants have been unjustly enriched to the detriment of Hinterberger.

159.    Equity and good conscience dictate that the City be required to pay for the time spent in development of these models, as well as for their continued use.

WHEREFORE, Plaintiffs pray for the following relief against the City of Indianapolis as follows:

(i)     declare that the Defendants have been unjustly enriched;

54

(ii)     award actual losses caused by the unjust enrichment, including but not limited amounts that Plaintiffs did not receive for all work performed on behalf of the City;

(iii)    punitive damages in an amount to two times the amount awarded above;

(iv)    pre-judgment interest;

(v)     attorneys' fees and costs; and

(vi)    such further relief as the Court determines is just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all counts.

Dated:  May 31, 2016

Respectfully submitted,

*Mary Jane Lapointe*

One of their Attorneys

Mary Jane Lapointe
Daniel L. Kent
LAPOINTE LAW FIRM, P.C.
One North Pennsylvania Avenue
Suite 730
Indianapolis, Indiana 46204

(312) 829-5870
(312) 829-5871(fax)


*Subject to admission pro hac vice:*

Michael Rachlis
Kevin B. Duff
RACHLIS DUFF ADLER PEEL
 & KAPLAN, LLC
542 South Dearborn, Suite 900
Chicago, Illinois 60605
(312) 733-3950
(312) 733-3952 (fax)