UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LEIF HINTERBERGER, | ) | |
| 49-50 LLC, | ) | |
| CARREAU DESIGN CORPORATION, | ) | |
| 49TH STREET SHOPS LLC, | ) | |
| UPTOWN RETAIL LLC, | ) | |
| UPTOWN BUSINESS CENTER LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:16-cv-01341-SEB-MJD |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND OTHER PENDING
MOTIONS (DKTS. 132, 137, 149, 157)**

Plaintiffs sued various Defendants, among them the City of Indianapolis ("the

City"), under 42 U.S.C. § 1983 and state law for alleged harms arising from Plaintiffs'

failed real-estate development bid. Now before the Court is the City's motion for

summary judgment, Dkt. 132, *see* Fed. R. Civ. P. 56, and collateral motions. Dkts. 137

(sanctions), 149 (motion *in limine*), 157 (same). For the reasons given below, the motion

for summary judgment is granted. The motions *in limine* are denied as moot without

further discussion. The City's motion for sanctions is denied without prejudice on the

terms described under "Conclusion and Order" below.

## Background

Plaintiffs are Leif Hinterberger, an Indianapolis real estate developer, and his

companies, whom we refer to collectively as "Hinterberger." (The Clerk has previously

entered the default of Defendant Mansur Real Estate Services, and Defendant Charles Cagann ("Cagann") has been dismissed by stipulation.) Much of what follows is taken directly from the City's "Statement of Material Facts Not in Dispute," for reasons explained below.

In spring 2005, Hinterberger had modest plans for a small retail development he called "The Uptown" to occupy five plots of land at the northwest corner of the intersection of 49th Street and College Avenue in Indianapolis. Hinterberger closed on the sale of the five plots in April of that year. As initially conceived, Hinterberger had no plans to pursue public financing, funding, or grant money for The Uptown.

At the time, Maury Plambeck ("Plambeck") was serving as the director of the City's Department of Metropolitan Development (DMD). Plambeck expressed excitement about Hinterberger's project and suggested that Hinterberger add apartments. Adding a housing component to the project required Hinterberger to acquire the remaining half of the block. Initially, Hinterberger did not want to add a housing component because in his opinion it did not make financial sense. Plambeck then suggested to Hinterberger that the City could put together a package of public funding taken from various sources to help finance the development.

Hinterberger had never sought public financing before 2005 but he was interested in seeking public financing for The Uptown. Between 2007 and 2011, the City presented public financing options to Hinterberger. The options came with different contingencies outlined in four commitment letters. The City made clear the options were subject to detailed terms and execution of a final definitive project agreement. Hinterberger never

satisfied the contingencies and conditions for receipt of public funds, and thus no final written agreement was ever executed.

Plambeck recommended that Hinterberger work with Cagann, a partner with Mansur Real Estate Services ("Mansur"), who was familiar with development projects that entailed a public financing component. In 2000, the City's Metropolitan Development Commission had contracted with Mansur to oversee another development project in Indianapolis, which was substantially completed by 2004. This was the only contract Mansur ever entered into with the City.

In late 2005, Hinterberger sought out Cagann to ask whether Mansur was interested in partnering with him on The Uptown. At Hinterberger's request, Cagann signed a nondisclosure agreement on behalf of Mansur ("the NDA"). The City was not a signatory to that agreement. The parties to the NDA were only Mansur and one of Hinterberger's companies.

At some point in 2005, Hinterberger began sharing economic modeling information with Cagann and Plambeck related to the 49th Street and College Avenue corridor. By 2007, he had completed his economic modeling, acquired the other half-block of real estate at 49th and College (four additional lots, now nine in total), and rezoned the land to build an expanded project. But by 2008, the real estate market was in serious decline and nearly every developer was feeling those negative effects.

By July 2010, Hinterberger was experiencing financial difficulty. He had defaulted on loans and lenders were looking to short-sell his properties. Hinterberger knew that if he lost control of the properties, there was a good chance the expanded project would not

come to fruition. By December 2010, Hinterberger had sold the four additional lots he had acquired in 2007.

By late 2011 or early 2012, Hinterberger was bankrupt. He lost the original five lots at 49th Street and College Avenue at a sheriff's sale in August 2012. By October 2012, Hinterberger's bankruptcy attorney was threatening the City with litigation. This lawsuit was filed on three-and-a-half years later on May 31, 2016. Dkt. 1.

The complaint charges the following causes of action: Count I, a Section 1983 "*Monell* claim"; Count II, state-law promissory estoppel; Count III, state-law equitable estoppel (Count III has been withdrawn. Dkt. 131, at 8 n.1); Count IV, a Section 1983 Equal Protection Clause claim; Count V, a Section 1983 substantive due process claim; Count VI, a Section 1983 procedural due process claim; Count VII, state-law breach of contract; Count VIII, state-law misappropriation of trade secrets; and Count IX, state-law unjust enrichment. These claims are the subjects of the pending summary judgment motion filed by the City.

### Standard of Decision

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A party that does not bear the burden of persuasion may move for summary judgment 'by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (nested quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 137, 325 (1986)). If "'the non-movant does not come forward with evidence that would

reasonably permit the finder of fact to find in h[is] favor on a material question, then the court must enter summary judgment against h[im].'" *Id.* (emphasis omitted) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

Under our local rules, a movant's brief "must include a section labeled 'Statement of Material Facts Not in Dispute' containing the facts[] that are potentially determinative of the motion[,] and as to which the movant contends there is no genuine issue." S.D. Ind. L.R. 56-1(a) (internal subdivisions omitted). The nonmovant's brief similarly "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L.R. 56-1(b). Such statements should contain only material facts, "not . . . mere background facts," and must "state facts, not the party's argument . . . ." S.D. Ind. L.R. 56-1(a) cmt.; S.D. Ind. L.R. 56-1(b) cmt. "[E]ach fact" asserted in a brief must be supported by a "specif[ic]" citation to the record. S.D. Ind. L.R. 56-1(e). The court "has no duty to search or consider any part of the record not specifically cited" in this manner. *Id.* The movant's facts "are admitted without controversy" unless the nonmovant "specifically controverts" them in his fact statement; shows them to be unsupported by admissible evidence; or shows that reasonable inferences in his favor can be drawn from them sufficient to preclude summary judgment. S.D. Ind. L.R. 56(f)(1)(A)–(C).

In outline form, this procedure has been well settled for more than thirty years. And for more than thirty years, nonmovants have frequently "'misconceive[d] what is required of them.'" *Modrowski*, 712 F.3d at 1167 (quoting *Waldridge*, 24 F.3d at 921).

Against even this backdrop, though, Hinterberger's opposition brief stands out as remarkable. It has all the appearance of diligence and competence without a crumb of their substance. It is difficult to overstate how frustrating this is to the Court; how breezily, almost cheerfully deficient; how negligent of the applicable law, not to mention the truth; how unrelentingly at war it is with a "just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1. A few observations and examples may help to illustrate the severity of the problem we have faced in our struggle to correctly and justly resolve the issues before us; an exhaustive account is simply beyond us.

The summary judgment record spans nearly 2,000 pages; 1,935, to be precise. There are, thus, a great many "facts." The City's disciplined "Statement of Material Facts Not in Dispute" is six pages in length, divided into thirty numbered paragraphs. Out of a forty-four-page brief, Hinterberger's "Material Facts Precluding Summary Judgment" is twenty-one pages long, none of which is responsive to, or shows more than a dim awareness of, the City's fact statement. "There is no attempt to controvert the factual averments set forth in [the City's] own statement[.]" *Waldridge*, 24 F.3d at 922. It is simply a narrative, one that is exceptionally difficult to follow and woven principally from strands of insinuation and innuendo. This "defeats the whole point" of the fact statement required by Local Rule 56-1(b)—"to identify just what facts are actually in dispute." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (former N.D. Ill. L.R. 12(N)).

Hinterberger's fact statement is divided into nine sections. The sections bear headings such as: "There are disputed issues of fact created by the uncontested facts of

Hinterberger's performance and detrimental reliance." "There are disputed issues of fact created by the City's acts and statements destroying Hinterberger's ability to work as an Indianapolis developer." Br. Supp. i. But the respective sections do not speak to any disputes at all. For example, the latter section, two paragraphs long, simply asserts: "The City and its agents were actively involved in destroying not only the Uptown project and the neighboring Uptown Business Center but also Hinterberger's livelihood and reputation." Br. Opp. 20. What is the dispute? "The statement is so full of argument" and tedious rhetoric that again "the whole point" of it is defeated. *Bordelon*, 233 F.3d at 528.

The above-mentioned two paragraphs are supported by a total of three citations. They refer nonspecifically to a four-page e-mail exchange, a fifteen-page e-mail exchange, and a thirteen-page e-mail exchange, respectively. Pls.' Exs. 107, 108, 109. But procedural rules require that assertions of fact be supported by "specif[ic]" citations. S.D. Ind. L.R. 56-1(e). *Also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004). The e-mail exchanges occurred between City officials discussing two e-mails from Hinterberger in which they raise concerns about Hinterberger's mental health and stability. This is the only evidentiary support for the charge, "The City and its agents were actively involved in destroying . . . Hinterberger's livelihood and reputation." Br. Supp. 20. It is beyond generous to say that no reasonable jury could infer the latter from the former.

Other assertions dispense with even the appearance of support:

> With this inflammatory slander expressed to the head of
> DMD, Hinterberger's ability to get any project off the ground
> in Indianapolis were significantly undermined, as seen by the

> fact that Thies would not discuss the Uptown (even though he
> recognized that the project was not dead). Indeed, it was
> Vaughn (not Hinterberger) who [in order] to change
> directions on the communications, inserted lawyers into the
> mix. However, Hinterberger did not make such threats against
> the City.

*Id.* (no citations omitted) (footnote text moved to body text). These are only two

paragraphs from the brief but they are fairly representative of Hinterberger's entire fact

statement.

"[I]f a material fact is not disputed (or if there is no evidence that controverts the

fact), the district court is entitled to know that up front, without first having to examine

citations to evidence having only marginal bearing on the question." *Bordelon*, 233 F.3d

at 528. "And a mere disagreement with the movant's asserted facts is inadequate if made

without reference to specific supporting material." *Smith v. Lantz*, 321 F.3d 680, 683 (7th

Cir. 2003) (citing *Edward E. Gillen Co. v. City of Lake Forest*, 3 F.3d 192, 196 (7th Cir.

1993)). "In short, 'judges are not like pigs, hunting for truffles buried in briefs.'" *Id.*

(alteration omitted) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Had we enough time and patience and fortitude, a detailed study could be made of

Hinterberger's citation practices. Their effects range from the comical to bewildering to

profoundly misleading.

For example, Hinterberger's opposition brief adverts repeatedly to the claim that

DMD official Reginald Walton ("Walton"), in accordance with City policy, used his

position to frustrate Hinterberger's designs through the use of sham environmental

remediation work. At one point in his fact statement, Hinterberger states,

As [he] [was] arrang[ing] for his Uptown Business Center LLC to file for bankruptcy so as to negotiate repurchase of the property, Reggie Walton's DMD department [*sic*] sent environmental remediation trucks to the site (Ex. 103), and similar to what occurred at the Uptown, a sudden appearance of environmental remediation trucks made it virtually impossible to arrange for refinancing. (Ex. 104; Ex. 105, ¶ 7)

Br. Opp. 19. Though we focus below on the three record citations, "Walton's DMD department" is also an instructive example of Hinterberger's dubious tendency toward insinuation. "Walton's official title was Assistant Administrator for the Department of Metropolitan Development" and he was later convicted of honest-services fraud on the City and on the department for which he worked. *United States v. Johnson*, 874 F.3d 990, 994, 998–99 (7th Cir. 2017) (proceedings on which Hinterberger places considerable reliance).

Plaintiffs' Exhibit 103 comprises a series of three unidentified, undated photographs: one of a white pickup truck bearing the inscription "MIDWAY SERVICES, INC."; one of a group of nine black barrels or drums; and one of a white van bearing the inscription "VAPOR PROTECTION SERVICES." There is no foundation established for these photos or further explanation. There is not even a "buried truffle" to be rooted out.

Exhibit 104 is a document comprising twenty-eight blacked-out pages. There is nothing else. It is simply a series of twenty-eight, eight-and-a-half by eleven, blacked-out rectangles. In the CM/ECF system, it is marked "REDACTED." Quite apart from its inherent obfuscation, there is absolutely no procedural warrant for such a submission. *See* Fed. R. Civ. P. 5.2; S.D. Ind. L.R. 5-11(c)(2).

Exhibit 105 purports to be the affidavit of "Michael Mergell," a person nowhere

identified, filed in connection with the bankruptcy of Uptown Business Center, LLC.

Paragraph 7 reads in full:

> In our view this Uptown Business Center is refinanceable, with terms commensurate to the terms offered, once the issues surrounding chain of title, warrantees, insured closing and now environmental are resolved. The indubitable, actual value of the existing note purchased has many clouds within the title. In my opinion for the open market to purchase this note, for this junk note to have the note valued at the offering these issues would need to be cleared up.

Pls.' Ex. 105 ¶ 7.

Nowhere in any of this "evidence" is there any mention of (1) DMD, (2) Walton, (3) the sudden appearance of environmental remediation trucks, or (4) refinancing being made virtually impossible because of the sudden appearance of environmental remediation trucks. Indeed, in stating that the Uptown Business Center "is refinanceable," Pls.' Ex. 105 ¶ 7, Mergell's affidavit (whoever he may be) flatly contradicts point (4) above. We can only conclude Hinterberger has wagered that no one will look into the matter too closely.

A second set of examples taken from the argument section of Hinterberger's brief fleshes out the point. Hinterberger states,

> [City officials] assail[ed] Hinterberger's good name, reputation, honor, and integrity in a manner that "seriously affected" his work as a real estate developer. The DMD director—the head of the office that handles developments and zoning—testified that he could not work with Hinterberger due to Vaughn's statements. (Ex. 88, Thies 176:15–177:24) Hinterberger attempted to establish relationships with other Indianapolis real estate development firms as investors, and after the City spoke with them they refused to work further with Hinterberger. (Ex. 131; Ex. 15,

Cagann 238–240) It was impossible for Hinterberger to act as a developer in Indianapolis given the City's statements and conduct.

Br. Opp. 32 (no citations omitted).

The cited excerpts of Thies's deposition, Pls.' Ex. 88, neither mention Vaughn, nor reference his comments, nor contain any statement by Thiel that he could no longer work with Hinterberger. "Ex. 131" is a nonspecific citation to a thirteen-minute audio recording apparently of a telephone conversation between Hinterberger and "Austin Carmony," who (like Mergell) is nowhere identified. It is in addition obviously inadmissible hearsay. More notably, throughout their conversation, "Austin Carmony" does nothing but express a willingness to work with Hinterberger. Finally, the cited excerpts of Cagann's deposition, Pls.' Ex. 15, like the citations to Thies's, have nothing to do with the statement it allegedly supports. Cagann Dep. 238:1–240:25 (explaining real estate developers "that do the affordable housing thing" require municipal backing of prospective development partners). As above, we conclude that Hinterberger can only have operated on the assumption that no one would be checking his factual assertions against his record citations.

These and other problems are compounded by Hinterberger's persistent equivocations on matters nominally at the heart of his case and by his seemingly studied refusal to understand materiality. For example, the second section of his fact statement bears the heading, "There are disputed issues precluding summary judgment based on evidence that the City required Hinterberger to work under a gag order and through and with not for profit groups and Cagann." Br. Opp. i. Hinterberger elaborates: "[A]s a *quid*

*pro quo* for continuing the City's commitment" to Hinterberger, the City "made

Hinterberger agree to not publicly complain about delays or conditions imposed on upon

him by the City, and not take actions" against the City's mayoral administration. Br.

Supp. 6. But which was it—a "gag order" (a phrase that appears seven times in

Hinterberger's opposition and a notion that appears several times more) or a "*quid pro*

*quo*" and an "agree[ment]"? Later in his fact statement, Hinterberger settles on "'gag

order' agreement." Br. Supp. 14.

In any event, the only record support for an "agreement" in the above cited

passage relates to Hinterberger's promise, contained in an e-mail between City officials

and "not adhere[d] to" by him, to communicate with the City "not as a one-off project"

but as part of a "team" with other project partners. Pls.' Ex. 49, at 1. Hinterberger

designates this e-mail twice, Pls.' Exs. 49, 126, and cites it twice within the same citation

under two different exhibit numbers, fairly eliminating the possibility of mistake on his

part and creating the false appearance of greater support than his factual assertion is

entitled to receive. Again we are forced to conclude that Hinterberger has assumed no

one would be checking.

It appears to have struck Hinterberger belatedly that he must make a distinction

between voluntariness and coercion in order to convert a businessman's poor business

decisions into a campaign of constitutional and state-law torts. In his fact statement,

Hinterberger states, "Plambeck stated that [if Hinterberger pursued an expanded Uptown

project,] the City would make the zoning approval for such development smooth, but

would on the other hand make zoning difficult were Hinterberger not to accede to the

City's demands." Br. Opp. 3. This apparently is the City's original sin, the primary coercive act that laid the chains of necessity upon Hinterberger in all his future dealings with the City. For this proposition Hinterberger cites only his own deposition and his own affidavit. Hinterberger Dep. (Pls.' Ex. 1) 67:4–69:19, 70:22–71:14; Hinterberger Aff. (Pls.' Ex. 4) ¶ 2.

In his deposition, there is nary a whiff nor a whisper of coercion. "And I crunched the numbers . . . [a]nd I said, you know, 'Maury, I'll try and add apartments to do a second story.'" Hinterberger Dep. 67:9–15. "So we looked at crunching numbers to do that. We said, 'Okay, Maury. We'll entertain looking at that . . . .'" *Id.* 68:4–6. He described his conversations with Plambeck as "[leading] into the excitement and then wanting to do more than just my base ideas." *Id.* 65:9–1. He characterized his working relationship with the City from 2005 to 2007 as "everything—everybody's working together. We were all—it all seemed very, very ordinary. What was going on seemed great." *Id.* 163:2–4. And Hinterberger identified "assistance with the zoning" as one of the City's promises to him. *Id.* 77:1. *See also* Dkt. 131, at 7 (Pls.' Statement of Claims) (Hinterberger "had a reasonable, investment-backed expectation that the Uptown would proceed and that the City would provide the funding necessary to fill the gap for the expanded project that the City requested and Hinterberger agreed to develop.").

The first mention of the zoning-difficulty threat appears in the record in Hinterberger's affidavit:

> During conversations with Maury Plambeck in the 2005 time period in which he stated that the City wanted me to scrap my retail project and build a larger, mixed using project

> Plambeck told me the City would pave the way for the zoning approval for such a mixed use development, but would on the other hand make zoning and permitting issues difficult were I not to accede to the City's demands.

Hinterberger Aff. ¶ 2. That affidavit was executed on April 19, 2018, more than six months after Hinterberger's November 2, 2017, deposition and, crucially, one day before he filed his opposition to the City's motion for summary judgment. It is transparently a sham. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016); *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–69 (7th Cir. 1996); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995).

Other examples of Hinterberger's misfeasance and malfeasance abound. Put simply, this is not lawyering in good faith. It is lawyering by confusion, equivocation, and obfuscation. It is antilawyering. Hinterberger's attorneys must show cause why they should not be sanctioned for it, beyond the litigation sanction we impose on Hinterberger here.

The Seventh Circuit has noted "the important function served by local rules that structure the summary judgment process[.]" *Bordelon*, 233 F. 3d at 527. The fact statements required by our local rule

> are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own. . . . [F]ailure to

> comply with the local rule [is], accordingly, not a harmless
> technicality, but a mistake that [the Seventh Circuit's]
> precedents (for good reason) have deemed fatal.

*Waldridge*, 24 F.3d at 923, 924.

Here, Hinterberger's noncompliance with our summary judgment procedures goes well beyond what could even arguably be characterized as technical. "[I]t is improper for a party to misstate the cited record[,]" yet Hinterberger does so repeatedly. *De v. City of Chicago*, 912 F. Supp. 2d 709, 712 (N.D. Ill. 2012) (citation omitted). "A misleading statement of facts increases the opponent's work, our work, and the risk of error." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1224 (7th Cir. 1995) (fact statement in appellate brief). Our local rules mandate that a nonmovant's fact statement contain only "the facts[] that are potentially determinative of the motion[,] and as to which the movant contends there is no genuine issue[,]" S.D. Ind. L.R. 56-1(b), not irrelevant information or argument, *id.* cmt., but Hinterberger's is "filled with irrelevant information, legal arguments, and conjecture." *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (N.D. Ill. L.R. 56.1). Hinterberger's statement "obfuscates[s] the true issues at stake and . . . serve[s] only to further burden an already burdened judicial system and to frustrate the [the City's] attempts to marshal its resources in a targeted defense against his allegations." *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) (*pro se* nonmovant). It is an intolerable burden.

Hinterberger's fact statement is therefore stricken in its entirety. *Cady*, 467 F.3d at 1061 (affirming same) *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809–10 (7th Cir. 2005) (affirming same); *Bordelon*, 233 F.3d at 529 (affirming same); *Waldridge*, 24 F.3d

at 924 (affirming same). We cannot separate the dross from the silver, if any there is; the defects are radical and pervasive. "The Court . . . deem[s] [the nonmovant's] facts admitted without controversy to the extent they are supported by admissible evidence and not specifically controverted." *SEC v. Koester*, 13 F. Supp. 3d 928, 931 (S.D. Ind. 2014) (citing S.D. Ind. L.R. 56-1(f)). In deciding the City's motion, we thus rely only on the City's "Statement of Material Facts Not in Dispute." *Cady*, 467 F.3d at 1061. This "limit[s] the scope of facts a court may take into account" in determining whether summary judgment is warranted, but "[t]he choice between reasonable inferences from facts is a jury function. Reducing the pool from which these inferences may be made does not change this maxim of our jurisprudence." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997) (citation omitted).

<u>Analysis</u>

We first conclude that the City is entitled to judgment on Hinterberger's constitutional claims. Electing to retain jurisdiction over the state-law claims, we reach the same result as to each of them.

**I.  Constitutional Claims Under 42 U.S.C. § 1983**

"Section 1983 creates a cause of action against any person who, under color of state law, 'subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blossom v. Dart*, 64 F. Supp. 3d 1158, 1161 (N.D. Ill. 2014) (quoting 42 U.S.C. § 1983). A Section 1983 plaintiff must show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Village of*

*Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). Hinterberger presents no triable Section 1983 claim.

### A. Due Process Clause

A state may not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1, cl. 3. The Due Process Clause comprises both a procedural and a substantive component, *Zinermon v. Burch*, 494 U.S. 113, 125 (1990), the former being "concerned with the manner in which a decision is made[,]" the latter "relat[ing] to the propriety of the decision itself[.]" *Bettendorf v. St. Croix County*, 631 F.3d 421, 426 (7th Cir. 2011). Hinterberger maintains that both his procedural and substantive due process rights were violated by the City.

### 1. Procedural Due Process (Count VI)

To make out a procedural due process violation, a plaintiff in Hinterberger's position must show: (1) a cognizable liberty or property interest, (2) its deprivation by a state actor, and (3) denial by a state actor of the process that was due upon the deprivation in light of its nature and circumstances. *Zinermon*, 494 U.S. at 125–126 (citing *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)); *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (citing *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)); *Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007) (citing *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996)); *Minch v. City of Chicago*, 486 F.3d 294, 302 (7th Cir. 2007) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 576–77 (1972)).

Assuming for the sake of decision that Hinterberger suffered a deprivation of a protected liberty or property interest, the deprivation was not without due process.

Hinterberger devotes a single paragraph to denial of due process, which contains not a single citation to the law or the facts. Br. Opp. 38. The claim accordingly is waived for failure to present evidence or argument on an essential element. *De v. City of Chicago*, 912 F. Supp. 2d 709, 733–34 (N.D. Ill. 2012) ("[A] party will be deemed to have waived a claim for failing to cite both legal authority and supporting factual evidence (citing *Gross v. Town of Cicero*, 619 F.3d 697, 708 (7th Cir. 2010); *Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)). Waiver notwithstanding, because of the centrality of the notion to Hinterberger's case that he was deprived of an opportunity of redress, we briefly address the merits.

The process that is due upon deprivation of occupational liberty by stigmatization is a name-clearing hearing. *Snowden v. Adams*, 814 F. Supp. 2d 854, 873–74 (C.D. Ill. 2011) (citing cases). If we had not stricken his fact statement, Hinterberger would rely entirely on the "gag order," which, he says, barred him from filing a lawsuit. Hinterberger thus impliedly concedes the obvious point that he did not actually want a name-clearing hearing. "Plaintiffs don't want *process*; they want money[,]" *Goros v. County of Cook*, 489 F.3d 857, 860 (7th Cir. 2007), that is, damages for defamation. But "the Fourteenth Amendment [is not] a font of tort law." *Paul*, 424 U.S. at 701.

As for the deprivation of protectable property interests, even if the "gag order" had in any way discouraged Hinterberger from filing suit, it would not amount to a denial of due process. Procedural due process requires only notice and an opportunity to be heard, *Taake v. County of Monroe*, 530 F.3d 538, 543 (7th Cir. 2008), no matter whether that opportunity is ultimately taken. A person deprived of liberty or property who agrees not

to avail himself of constitutionally adequate procedures has not suffered a deprivation "without due process of law." *Palka*, 623 F.3d at 453; *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982). This is so even if the person faces a "difficult choice" between foregoing available process in exchange for substantial benefits and availing himself of available process at the risk of losing those benefits. *Palka*, 632 F.3d at 453.

The procedural due process claim fails.

### 2.  Substantive Due Process (Count V)

In addition to its procedural component, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon*, 494 U.S. at 125 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The danger of governmental arbitrariness is gravest, and judicial scrutiny sharpest, in the field of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plur.); *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)).

We begin, as with procedural due process, with the existence of protected liberty and property interests. *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008) (citing *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008)). "'Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary nor

irrational.'" *Id.* (quoting *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). If "the right infringed upon is an interest in property rather than life or liberty, the property owner must first establish either an independent constitutional violation or the inadequacy of state remedies to redress the deprivation before a court will consider whether the interference with property is arbitrary or irrational." *Id.* (citing *Lee*, 330 F.3d at 467).

Here, Hinterberger takes a four-word, parenthetical stab at implicating his fundamental liberty interest in free speech protected by the First Amendment as encroached upon by the "gag order." Br. Opp. 39. But, having stricken his fact statement, we ignore the "gag order," and undeveloped arguments are waived. *De*, 912 F. Supp. 2d at 733–34. In any event, the First Amendment is not implicated where expression is restricted by negotiated agreement in exchange for certain benefits. *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670–71 (1991); *Leonard v. Clark*, 12 F.3d 885, 889–90 (9th Cir. 1993). In such cases, "[t]he parties themselves . . . determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed." *Cohen*, 501 U.S. at 671. *Volenti non fit injuria*.

That leaves only Hinterberger's property interests. Hinterberger never argues that state-court civil process is inadequate to protect his property, and indeed impliedly concedes the contrary by arguing that he was denied procedural due process by not being able to avail himself of it. And Hinterberger is unable to show any independent constitutional violation.

The substantive due process claim thus fails as well.

*B. Equal Protection (Count IV)*

A state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). While protection against class-based discrimination is the "most familiar" equal protection guarantee, the Equal Protection Clause also "protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). To state such a "class of one" equal protection claim, a plaintiff must show that "he was 'intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.'" *Id.* (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)). Hinterberger's equal protection claim is of this variety.

Only intentional discrimination offends the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 242 (1976). In class-of-one cases, the minimum role for intent is "to distinguish between [impermissible] disparate treatment and [permissible] disparate impact." *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 900 (7th Cir. 2012) (*en banc*) (Easterbrook, J., concurring in the judgment). Still unsettled is the role of hostile intent, malice, or "animus" directed toward the plaintiff. *See Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016) (discussing divergent opinions in *Del Marcelle*). In short, "'something other than the normal rational-basis test applies to class-of-one claims,' even if that something has not been clearly delineated." *Id.* at 708 (quoting *Del Marcelle*, 680

F.3d at 900) (Easterbrook, J., concurring in the judgment)).

As an initial matter, it is seriously doubtful that a class-of-one claim founded on the state actor's failure to award public funds, grants, or loans is constitutionally cognizable.

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.

*Engquist*, 553 U.S. at 603.

*Engquist* removed public employees from the ambit of class-of-one claims. *Id.* at 609. Lower courts have applied *Engquist* to prosecution decisions, *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008), and, attentive to its emphasis on the distinction between the government's regulatory and proprietary functions, 553 U.S. at 598, to government contractors, *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008), and, tentatively, extensions of the municipal water supply. *Srail v. Village of Lisle*, 588 F.3d 940, 944–45 (7th Cir. 2009). It is likely that the proprietary, highly discretionary decision whether to award public funds, grants, or loans to a private real estate developer in support of a private development project is controlled by *Engquist* as well. But the City has not raised the point.

"'[A] class-of-one plaintiff must, to prevail, negative any reasonably conceivable state of facts that could provide a rational basis'" for the difference in treatment. *Id.* at

1121 (quoting *Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014)). "[E]ven at the pleadings stage, 'all it takes to defeat a class-of-one-claim is a *conceivable* rational basis for the difference in treatment.'" *Id.* (quoting *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013)) (alterations omitted). "[T]he test for rationality does not ask whether the benign justification was the *actual* justification." *D.B.*, 725 F.3d at 686. As for animus, not even the *Del Marcelle* dissent held that it can complete an equal-protection violation where the government's conduct is rational. *See* 680 F.3d at 917–18 (Wood, J., dissenting).

Hinterberger complains that other Indianapolis developers received public funding for their projects whereas his did not. But he has not answered the City's entirely obvious argument that those developers and Hinterberger were rationally treated differently because those developers satisfied the conditions for receipt of public funding while Hinterberger did not. The funding source of which Hinterberger chiefly complains was not established until July 2012, and funds were not available for distribution until May 2015. By August 2012, Hinterberger was bankrupt and all nine lots between 49th Street and 50th Street had been sold after being foreclosed on by Hinterberger's creditors. It should be obvious that solvent and insolvent developers are not similarly situated with respect to municipal investment decisions. As the City's lawyer told Hinterberger's lawyer by letter dated April 12, 2012, Hinterberger's "pending bankruptcy and the fact that [the funding source] ha[d] not yet been created" were "significant hurdles" to Hinterberger's obtaining the funds. Def.'s Ex. Q, at 1.

Hinterberger has not shown that the other developers were not subject to the same

relevant funding conditions, or that the other developers failed to satisfy those conditions while still receiving public funding. To the extent that Hinterberger complains the other developers were not subject to, for example, conditions relating to obtaining affordable-housing funding, the fault is not in public corruption but in himself. If Hinterberger did not wish to be subject to affordable-housing funding conditions, he need not have ever applied for affordable-housing funding.

There are, as always, exceptional cases, "where disparate treatment 'is easily demonstrated but similarly situated individuals are difficult to find[,]'" *Brunson*, 643 F.3d at 706 (quoting *Swanson*, 719 F.3d at 784), and comparators are not necessary to "'distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection.'" *Id.* at 707 (quoting *Geinosky*, 675 F.3d at 748). In a footnote, Hinterberger declares that he does not "waiv[e] the applicably of such rule" to his case, Br. Opp. 35 n.22, but by raising the issue only in a footnote without any supporting argument, he has of course done precisely that—he has waived it. *Feather v. SSM Health Care*, 216 F. Supp. 3d 934, 941 n.4 (S.D. Ill. 2016).

The equal protection claim also fails.

*C.   "Monell Claim" (Count I)*

Though Hinterberger has pleaded it separately, a *Monell* claim is not an independent claim to relief. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality may be held liable for constitutional injury proximately caused by its municipal policies or customs with the force of law. Where the plaintiff suffers no constitutional injury, the municipal defendant may not be held liable. *Petty v. City of*

*Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014) (citing *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008)).

As explained above, Hinterberger has not shown that any reasonable jury could find he suffered any constitutional injury. Accordingly, there is nothing to hold the City liable for, and the "*Monell* claim" fails.

## II. Retention of Jurisdiction

The state-law claims are before us under our supplemental jurisdiction. Compl. ¶ 15. *See* 28 U.S.C. § 1367. "When the federal claim[s] in a case drop[] out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim[s] to the state courts." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008) (citing *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993)). The presumption may be overcome where

> "the statute of limitations has run on the pendent claim,
> precluding the filing of a separate suit in state court"; . . .
> "substantial judicial resources have already been committed,
> so that sending the case to another court will cause a
> substantial duplication of effort"; or . . . "when it is absolutely
> clear how the pendent claims can be decided."

*Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Assoc'd Ins. Co.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).

Here, (more than) substantial judicial resources have already been committed to this matter, and, as explained below, it is absolutely clear that Hinterberger's state-law claims fail. Comity dictates that we complete what we have here begun. Accordingly, we retain jurisdiction over the state-law claims and enter our rulings below.

### III. State-Law Claims

Hinterberger fares no better under state law than under the Constitution. We apply Indiana law under *Erie Railroad Company v. Thompkins*, 304 U.S. 64 (1938), *see Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)) (*Erie* applies to 28 U.S.C. § 1367 as well as to § 1332), because that is our default choice, *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994), and because neither party disputes its applicability. *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 427 (7th Cir. 1991).

#### A. Promissory Estoppel (Count II)

Where a promise is contractually unenforceable for want of a bargained-for exchange, the equitable doctrine of promissory estoppel may imply a contract by estopping the promisor to deny its promise. *First Nat'l Bank of Logansport v. Logan Mfg. Co., Inc.*, 577 N.E.2d 949, 954 (Ind. 1991). The elements of promissory estoppel are "(1) a promise by the promissor (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise." *Id.* (adopting *Restatement (Second) of Contracts* § 90 (Am. Law Inst. 1981)). Additionally, (6) a governmental entity may be estopped only "when 'the public interest' will be threatened" unless there is an estoppel. *Johnson Cty. Plan Comm'n v. Tinkle*, 748 N.E.2d 417, 420 (Ind. Ct. App. 2001) (citing *Cablevision of Chi. v. Colby Cable Corp.*, 417 N.E.2d 348, 357 (Ind. Ct. App. 1981)).

Hinterberger seeks to estop the City to deny the City's "various promises to [him]

in regards to the approvals for and financing of The Uptown project development . . . ." Compl. ¶ 114. The City argues that promissory estoppel fails because no reasonable jury could find that Hinterberger reliance on the City's promises was reasonable. (The argument is presented under the rubric of the due process claim but, as Hinterberger acknowledges, Br. Opp. 30, the due process claim in relevant part requires a valid promissory estoppel claim.) The City argues further that there is no evidence the public interest will be threatened unless the City is required to fund The Uptown. Hinterberger offers not a single word in answer to either argument, thereby waiving the issues and abandoning the claim. *De v. City of Chicago*, 912 F. Supp. 2d 709, 733–34 (N.D. Il. 2012).

Even absent waiver and the striking of Hinterberger's fact statement, Hinterberger could not show that he reasonably relied on any statement by City officials as "being a promise in the sense of a legal commitment[.]" *Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 F.3d 698, 705 (7th Cir. 2004) (emphasis omitted) (applying Indiana law). Among other reasons, that is because it is well established in Indiana law that "municipal officers have no power to enter contracts except where that authority is expressly granted by statute; and municipal officers must pursue and exercise such authority in strict compliance with the mode prescribed by statute." *City of Gary v. Major*, 822 N.E.2d 165, 171 n.3 (Ind. 2005). Municipalities' counterparties are charged with knowledge of these statutory prescriptions. "'If one dealing with the city could plead ignorance of the laws governing the city or of the appropriated balance which the city has and thereby make valid a contract made by the city contrary to [law], the effect of such [law] would be

destroyed.'" *Peoples State Bank v. Benton Twp.*, 28 N.E.3d 317, 327 (Ind. Ct. App. 2015) (quoting *Hamer v. City of Huntington*, 21 N.E.2d 407, 411 (Ind. 1939)).

Law and common sense charged Hinterberger, a self-described "successful and respected Indianapolis real estate developer," Br. Opp. 1, with knowledge that in putting together a multimillion-dollar public-financing package for a private real estate development, there is potentially many a slip 'twixt cup and lips. *See Garwood Packaging*, 378 F.3d at 704.

First, the City's offers of support for The Uptown embodied in its letters of April 4, 2008, November 12, 2009, February 26, 2010, and September 16, 2011, clearly identify the conditions attached to the award of the grants and loans sought by Hinterberger. Hinterberger never satisfied those conditions, though there is evidence that he appreciated their importance. *See* Def.'s Ex. T, at 1 (attorney letter of Oct. 4, 2012) (complaining "final implementation of [the City's] financial support [had been] predicated on a number of fluctuating conditions"). He offers here no cogent argument as to why he was entitled to the grants and loans nevertheless.

Second, state law prohibited the City or its departments or employees from obligating themselves to an extent greater than the budget appropriations for them, Ind. Code § 36-4-8-12(b), and no additional appropriation for The Uptown was ever made to Plambeck or the DMD. Fults Aff. (Def.'s Ex. B) ¶¶ 8–10. Hinterberger was charged with knowledge of this prohibition.

Third, City ordinance did not authorize Plambeck as DMD director to enter into any contracts nor Huber as deputy mayor for development, absent specific and explicit

mayoral authorization of which there is no evidence. Rev. Code of the Consol. City and Cty. of Indianapolis and Marion §§ 231-212 (omitting DMD director's authority to execute contracts), 201-4 ("The deputy mayors shall have only such powers of the mayor as are specifically and explicitly delegated . . . ."). City ordinance further made voidable any contract entered into contrary to state law or any contract not signed by the corporation counsel, the City controller, and the mayor "prior to its execution by the parties"—that is, its execution in writing. *Id.* § 141-102I. Hinterberger was charged with knowledge of these limitations as well.

Hinterberger's reliance on the City's "promises" as "*being* . . . promise[s] in the sense of . . . legal commitment[s]" was not reasonable. *Garwood Packaging*, 378 F.3d at 705. He ought to have known, and appears in fact to have known, that state and local law and the conditional nature of the City's offers of support, at the least, stood between himself and his legal entitlement to receipt of public funding on the basis of Plambeck's and any others' oral "promises." Hinterberger was "the gratuitous author of his own disappointment" as a matter of law. *Id.* at 703.

The promissory estoppel claim fails.

### B. Breach of Contract (Count VII)

Hinterberger sues the City for breach of the NDA. He thus seeks to hold the City liable for breach of a contract to which it was not a party. Only Mansur was a party to the NDA, through its agent Cagann. *Id.* at 4. The City is nowhere mentioned or even alluded to in the NDA. *See id. passim.* "'It goes without saying that a contract cannot bind a nonparty.'" *Northbound Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 650 (7th Cir. 2015)

(quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)).

In a one-paragraph argument, Hinterberger contends that "Cagann executed [the NDA] in privity with the City, binding the City to the NDA[,]" and that "the City was the intended beneficiary of the NDA." Br. Opp. 44. As for "privity," "a party to a contract [cannot] sue a non-party for breach of the contract simply because the non-party has a close relationship with the other party to the contract who has breached." *Northbound Grp.*, 795 F.3d at 651 (emphasis omitted). As for "intended beneficiaries," Hinterberger's cited authorities discuss third-party beneficiaries, who may enforce a contract although not a party to it. *Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990); *A.B.C. Home & Real Estate Inspection, Inc. v. Plummer*, 500 N.E.2d 1257, 1261 (Ind. Ct. App. 1986). This has nothing to do with nonparty liability for breach of contract. *Northbound Grp.*, 795 F.3d at 651.

Hinterberger alludes to agency principles in two footnotes, Br. Opp. 44 n.31 (citing *Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 230 (Ind. Ct. App. 1984)); Br. Opp. 27 n.18 (citing *Yeager v. McManama*, 874 N.E.2d 629, 638–39 (Ind. Ct. App. 2007)), but arguments raised in passing in footnotes are waived, *Feather v. SSM Health Care*, 216 F. Supp. 3d 934, 941 n.4 (S.D. Ill. 2016), and Hinterberger has done nothing to apply the law of agency to the facts.

In any event, the question of whether Cagann was authorized to bind the City to the NDA skips over the necessarily prior question of whether the NDA actually purports to bind the City. It does not. The NDA was "made and entered into . . . between [Hinterberger] and [Mansur]." Def.'s Ex. E, at 1. The NDA contains an unambiguous

integration clause. *Id.* at 4. Agency principles cannot be used to rewrite an unambiguous contract by adding parties never contemplated by the objective terms of the contract itself.

The breach of contract claim fails.

*C. Misappropriation of Trade Secrets (Count VIII)*

Under Indiana's Uniform Trade Secrets Act, Ind. Code ch. 24-2-3 (IUTSA), the Uniform Trade Secrets Act as adopted by Indiana, a person who misappropriates the trade secrets of another is liable in damages for the actual loss and unjust enrichment caused by the misappropriation, or for a reasonable royalty if neither is provable. *Id.* § 24-2-3-4(a), (b); *Infinity Prods., Inc. v. Quandt*, 810 N.E.2d 1028, 1032 (Ind. 2004).

Under the IUSTA, a "trade secret" is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind. Code § 24-2-3-2. Whether information is a trade secret is ordinarily a question of fact. *See Amoco Prod. Co. v. Laird*, 622 N.E.2d 912, 916 (Ind. 1993); *Woodward Ins., Inc. v. White*, 437 N.E.2d 59, 67 (Ind. 1982). "Misappropriation" is

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of another without

express or implied consent by a person who:

    (A)  used improper means to acquire knowledge of the trade secret;

    (B)  at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (i)   derived from or through a person who had utilized improper means to acquire it;

        (ii)  acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (C)  before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ind. Code § 24-2-3-2. Finally, "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.*

"[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing they exist." *Amoco Prod. Co.*, 622 N.E.2d at 920. Even if we had not stricken his fact statement, we would have had no idea what Hinterberger's purported trade secrets are or whether they actually existed.

Hinterberger retorts that it was the City's burden to place his allegedly protected materials in the record if it wished to rely on their insufficiency as trade secrets in support of its summary judgment motion. Br. Opp. 43 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Any first-year civil procedure law student may be consulted for the

proposition that *Celotex*'s blackletter text holds precisely the opposite.

The trade secrets claim fails.

### D.  Unjust Enrichment (Count IX)

Hinterberger pleads that, "[b]y taking and then using years of [his] economic studies and analyses to identify locations for development and economic impacts associated with such development," the City unjustly enriched itself at his expense. Compl. ¶ 158. This charge reflects the trade secrets claim almost verbatim, which charges that Hinterberger's "[i]nformation, studies and analyses that culminate[d] in the identification of areas targeted for development as well as economic analyses associated with selecting areas and how associated benefits may then spread" were trade secrets misappropriated by the City. Compl. ¶ 152. Hinterberger nonetheless avers that his unjust enrichment claim is "different (and much broader)" than his trade secrets claim, Br. Opp. 42, but as this comparison makes clear, that is not so.

The unjust enrichment claim is preempted by the IUTSA. Ind. Code § 24-2-3-1(c) (preemption provision); *Tecnomatic, S.P.A. v. Remy, Inc.*, 954 F. Supp. 2d 860, 868–69 (S.D. Ind. 2013) (Barker, J.) (unjust enrichment claim preempted by IUTSA); *HDNet LLC v. N. Am. Boxing Council*, 972 N.E.2d 920, 924–25 (Ind. Ct. App. 2013) ("all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information" preempted).

Hinterberger cites two cases which refused to preempt claims for misuse of intellectual property where the information sued on did not meet the statutory definition of "trade secret" under the Uniform Trade Secrets Act as adopted by Illinois. *Miller UK*

*Ltd. v. Caterpillar Inc.*, 859 F. Supp. 2d 941, 944–47 (N.D. Ill. 2012); *Abanco Int'l, Inc. v. Guestlogix Inc.*, 486 F. Supp. 2d 779, 781–82 (N.D. Ill. 2007). But that narrow and ultimately incoherent approach was precisely the approach rejected by the Indiana Court of Appeals in *HDNet*. 972 N.E.2d at 925.

Here, the City did not waive the preemption defense. Ordinarily, "if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004). But "'the rule . . . is . . . not to be applied rigidly.'" *Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (quoting *Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 570 (7th Cir. 2011)).

"[F]ailure to plead an affirmative defense can be harmless" where "the plaintiff had adequate notice of the defense and was not deprived of the opportunity to respond." *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997). Where "the plaintiff had an opportunity to respond to the argument by . . . filing a summary judgment response brief[,] . . . courts typically have found no waiver[,]" *Global Tech. & Trading, Inc. v. Satyam Comput. Servs. Ltd.*, No. 09 C 5111, 2014 WL 4057374, at *2 (N.D. Ill. Aug. 14, 2014) (citing cases), an especially sensible course "where the defense 'presents a straightforward question of law' . . . ." *Id.* (quoting *West v. United States*, No. 08-646, 2010 WL 4781146, at *3 (S.D. Ill. Oct. 25, 2010)). Clearly Hinterberger had and took, in his opposition brief, the opportunity to respond to the City's preemption defense as purely and straightforwardly a question of law. Br. Opp. 42–43.

The unjust enrichment claim fails.

## Conclusion and Order

For the reasons given above:

The City's motion for summary judgment, Dkt. 132, is GRANTED.

The City's motions *in limine*, Dkts. 149, 157 are DENIED as moot.

The five attorneys on Hinterberger's response brief in opposition to summary judgment are ORDERED TO SHOW CAUSE WITHIN FOURTEEN DAYS why they should not be sanctioned for the conduct described under "Standard of Decision" above. Fed. R. Civ. P. 11(c).

The City's motion for sanctions addresses the merits, or lack thereof, of Hinterberger's claims. But the City's arguments are too closely bound up with the lack of merit in Hinterberger's brief to be evaluated at this juncture. Accordingly, the City's motion for sanctions, Dkt. 137, is DENIED. We shall consider its arguments, to which Hinterberger has already responded, as appropriate on Hinterberger's attorneys' return to our show cause order.

No final judgment will enter at this time as the default of Defendant Mansur Real Estate Services remains unresolved.

IT IS SO ORDERED.

Date:    3/30/2019                        *Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kevin B. Duff
RACHLIS DUFF ADLER PEEL & KAPLAN, LLC
kduff@rdaplaw.net

Daniel LaPointe Kent
LAPOINTE LAW FIRM P.C.
dkent@lapointelawfirm.com

James A. Knauer
KROGER GARDIS & REGAS, LLP
jak@kgrlaw.com

Mary Jane Lapointe
LAPOINTE LAW FIRM PC
maryj@lapointelawfirm.com

Nicole Mirjanich
RACHLIS DUFFADLER PEEL & KAPLAN, LLC
nm@rdaplaw.net

Christopher H. Park
BINGHAM GREENEBAUM DOLL LLP (Indianapolis)
cpark@bgdlegal.com

Drew G A Peel
RACHLIS DUFF ADLER PEEL & KAPLAN LLC
dpeel@rdaplaw.net

Michael Rachlis
RACHLIS DUFF ADLER PEEL & KAPLAN LLC
mrachlis@rdaplaw.net

Adam Scott Willfond
OFFICE OF CORPORATION COUNSEL
adam.willfond@indy.gov